McVICKER, administrator, *v.* CONKLE.

1. An unrecorded instrument purporting to be a deed, signed by one person as maker, and attested by two other persons as witnesses, is admissible in evidence, upon proof showing that all three of these persons are dead, and that the signatures of the two latter upon the instrument are in their genuine handwriting.

2. It was error to admit in evidence a paper purporting to have been signed by a deceased person, the purpose being to compare the signature to this paper with the alleged signature of the deceased to another writing, the signature to the former paper not having been legally proved, nor acknowledged to be genuine.

3. The trial judge having violated section 3248 of the code by expressing or intimating, during his charge to the jury, an opinion as to what had been proved, a new trial must be granted.

April 15, 1895.  Brought forward from the last term.

Complaint for land.  Before Judge HUNT.  Henry superior court.  April term, 1894.

E. J. REAGAN, for plaintiff.

G. W. BRYAN and W. T. DICKEN, for defendant.

ATKINSON, Justice.

The plaintiff in error, A. V. McVicker, in his representative capacity as administrator upon the estate of Kellett Babb, brought an action of ejectment against the defendant for the premises involved in the pending controversy.  Both parties claimed under Kellett Babb; the former by virtue of his possession as administrator, and the latter, being the grandson of Kellett Babb, claimed title under and by virtue of a deed alleged to have been executed by Kellett Babb on the 11th day of August, 1870, to his daughter Rebecca E. Babb, and a deed from Rebecca E. Babb to himself, dated November 8th, 1890.  The deed from Kellett Babb to Rebecca E. Babb purports to have been signed by the maker in the presence of two witnesses, Miles H. Campbell, and Colville Babb, a son of Kellett Babb the maker.  Upon the trial, it appeared that both the maker and the subscrib-

ing witnesses were dead, and it was proven that the names subscribed to the deed as attesting witnesses were in the handwriting, respectively, of the two persons who purported to be subscribing witnesses. No witness testified to the actual signing of the deed by the maker, and no evidence was offered showing the signature of the alleged maker to have been in the handwriting of Kellett Babb. To the introduction of this deed the plaintiff objected, upon the ground that no such evidence of its execution had been submitted as would authorize its admission in evidence, which objection was overruled, and this is one of the principal grounds urged in support of the plaintiff's motion for a new trial which was subsequently made.

1. The rule has been long established, that an instrument purporting to be attested by a subscribing witness must be proved by the testimony of that witness, if he be accessible; the exceptions to the general rule being in favor of ancient documents which, upon the presumption of authenticity resulting from old age and attendant circumstances of verity, are said to prove themselves; official bonds required by law to be approved or attested by a particular officer; those papers which are only incidentally or collaterally material to the case. Our code provides, that if the witness is not produced, or, being produced, cannot recollect the transaction, the court may hear any other evidence to prove its execution. See §3838. If there be several attesting witnesses, the absence of all must be accounted for before secondary evidence will be received; but when the absence of all the attesting witnesses is accounted for, it will be deemed sufficient, in order to establish the execution of the writing, to prove the handwriting of one of them. In such a case, proof of the subscribing witness's handwriting is evidence of the execution of the instrument by the party therein named whose signature the instrument

purports to bear. It will not be necessary to prove the handwriting of the party. Phillips on Evidence, vol. 2, p. 214. In the case of Clark *v.* Courtney, 5 Peters, 318, Mr. Justice Story, delivering the opinion of the court, states the rule to be this : "In the ordinary course of legal proceedings, instruments under seal, purporting to be executed in the presence of a witness, must be proved by the testimony of the subscribing witness, or his absence sufficiently accounted for. Where he is dead, or cannot be found, or is without the jurisdiction, or is otherwise incapable of being produced, the next best secondary evidence is the proof of his handwriting; and that, when proved, affords *prima facie* evidence of a due execution of the instrument, for it presumed that he would not have subscribed his name to a false attestation. If, upon due search and inquiry, no one can be found who can prove his handwriting, there is no doubt that resort may then be had to proof of the handwriting of the party who executed the instrument; indeed, such proof may always be produced as corroborative evidence of its due and valid execution, though it is not, except under the limitations above suggested, primary evidence." In the case of Stebbins *v.* Duncan, 108 U. S. 44, the court, in stating the rule, employs the following language: "As the witnesses to the deed were shown to be dead, the method pointed out by law to establish the execution of the deed was by proof of the handwriting of the witnesses to the deed," citing Clark *v.* Courtney, 5 Peters, 319 ; Cooke *v.* Woodrow, 5 Cranch, 13. In 8 *Ga.* 206, case of *Settle* v. *Alison et al.*, this court states: "The rule is well settled, that where a subscribing witness to an instrument resides without the jurisdiction of the court, the *execution* of the instrument may be proved by proving the *handwriting* of the witness." In the case of *Watts* v. *Kilburn*, 7 *Ga.* 358, Judge Lumpkin, speaking for the court, states the rule to be: "But if the wit-

ness be dead, or blind or insane, or infamous, or interested since the execution of the paper, or beyond the process or jurisdiction of the court, or not to be found after diligent search and inquiry, the course is to prove his handwriting." Upon the general features of the rule, he makes the following observation : " Distinguished jurists have thought that proof of the handwriting of the party executing the instrument is better evidence of the execution than proof of the handwriting of the attesting witness"; and for this observation, he cites 3 Binn. 192; 2 Johns. 451; 11 Mass. 309. Thus it will be seen that in the classification of evidence, that is deemed primary which refers the question of execution to the handwriting of the subscribing witnesses, rather than to the handwriting of the alleged maker, where proof of handwriting is resorted to for that purpose; and while, as a rule of evidence, the one announced is too firmly established in the jurisprudence of this State to be called in question or disregarded by the judiciary, the writer, in the discussion which follows, speaking for himself alone, is of the opinion that it may well be doubted whether its literal application is likely to produce the most satisfactory results in the course of judicial investigation. For it will be observed, that none of the learned judges from whose opinions we quote, undertake to state the reason or origin of the rule itself. Mr. Justice Story, in the opinion from which we quote, uses with reference to it the following language : " Whatever may have been the origin of this rule, and in whatever reasons it may have been founded, it has been too long established to be disregarded, or to justify an inquiry into its original correctness." Upon the principle of *stare decisis* it was accepted by him as sound law; and Judge LUMPKIN, in the case above quoted, in accepting it upon the same principle, dismisses it with the observation that it is a technical and artificial rule, and one which prevails

over right reason in relation to this subject. Seeing that its wisdom has been called in question by so eminent an authority as the former distinguished Chief Justice of this court, and finding that Mr. Justice Story assigns no other reason for its acceptance than that it had been previously stated to be correct by those who were learned in the law, we have been at some pains to inquire whether or not the rule be really founded in right reason, and whether, under existing conditions, it might not be well for the General Assembly to consider the wisdom of adopting another, less arbitrary, less artificial, and more in consonance with the promptings of right reason. Our investigations have led us to inquire what reasons were assigned by the first judges who undertook to declare the rule in question; for investigation will reveal that none of those rules which enter into and constitute the great body of the law, and which, among the vulgar and uninformed, are sometimes erroneously termed technicalities of the law, were in the first instance either unwise or arbitrary, but were always based upon correct principles of reasoning and made necessary to meet conditions existing in society, and were really designed to be, and were at the time of their adoption, in furtherance of substantial justice; but times change, and men and conditions change with them, and hence that other maxim of the law, that when the reason of the law ceases, the law ceases with it; and therefore to the student of the law the earliest and most learned of the ancient commentators upon the common law of England urged the importance of a careful inquiry into the reasons and spirit of the laws, saying: "For by the arguments and reasons in the law, a man more sooner shall come to the certaintie and knowledge of the law." A careful investigation of the decisions in the English courts, diligently prosecuted through all the books to the earliest published reports of adjudicated cases, fails to disclose

any reason assigned by them for the adoption of the rule in question. We find it many times quoted, and stated substantially as at present recognized; but these courts, like those from our own country from which we quote, all accept it as one of the postulates of the law, and content themselves with a recognition of its binding force, without undertaking to justify upon reason its recognition or adoption.

In the earlier history of England, when the system of transferring estates by written evidence of title was first invented, but few, even of the nobility, were familiar with the art of writing; and it seems that about the time of the Norman Conquest, and before, seals were employed as representing and standing in lieu of the actual signature to an instrument by the maker. Blackstone states that "the method of the Saxons was for such as could write to subscribe their names, and, whether they could write or not, to affix the sign of the cross; which custom our illiterate vulgar do, for the most part, to this day keep up, by signing a cross for their mark when unable to write their names., With the Norman Conquest, however, was introduced by the chivalric, but densely illiterate, warriors of that day, a system of sealing all instruments by devices of various kinds, the designs of which were taken from such incidents in the life of the particular individual as, according to the fancy of each, served best to identify his particular personality, thereby substituting for their want of knowledge of letters, a system by which each individual was capable of being designated by his peculiar sign or device. But thereafter a statute was passed, in the reign of Charles II, reviving the ancient Saxon custom of requiring instruments of that character (deeds) to be signed as well as sealed; and to the end that the fact of execution might be established, it was requisite that this signing and sealing should be in the presence of witnesses,

who, in that day and time, if the deed were called in question, were required to sit upon the jury to assist in arriving at what was the true contract between the parties; it being presumed that these eye-witnesses to the transactions could more intelligently determine the question of fact as to the execution of the instrument, than parties not personally familiar with the fact of execution. From this circumstance, with the advance of knowledge, and the improvements in the method of administering the law, the rule was evolved which required the party affirming a deed to prove its execution by those who were called to witness the same, and not otherwise. The law requires always the highest and best evidence to be produced, of the truth of a fact sought to be established. These subscribing witnesses being those selected by the parties as the repositories of all the incidents connected with the execution of the paper, were therefore the ones required to be called upon to bear witness to the actual signing and sealing by the maker. Their testimony was and is the highest and best evidence capable of being procured, to the establishment of that fact. Their minds were presumed to have been addressed particularly to that subject, by those who were most interested in preserving a memorial of what transpired. Therefore it became the established rule to call these witnesses. Inasmuch as few of them were themselves able to write, they were not required to sign in person their own names upon the deed, but in earlier times they were indorsed there by the clerk or scrivener who drafted the deed, he himself acting in the capacity of a species of superior subscribing witness; and inasmuch as usually the grantor himself was incapable of signing his name, in case of the death or inaccessibility of all of these witnesses especially selected to attest the execution of the instrument, the next highest and best evidence would be proof of the handwriting of the subscribing witnesses. These were

the conditions at the time we get the first glimpse of the existence of the rule which authorizes the proof of the execution of an instrument by the maker, by evidence of the handwriting of the subscribing witnesses; and they afford a good reason for the adoption of the rule in question. It arose from the necessity of the case. The dense and almost universal ignorance of letters which prevailed in England, made the adoption of any other impracticable. In the classification of secondary evidence, this was the highest attainable of the execution of the instrument, and hence it was demanded in obedience to that rule of evidence which requires the highest and best evidence of the fact always to be produced. As we have seen, the maker himself being unable, except in rare cases, to write, there was a good reason for the adoption of a general rule of evidence authorizing the admission in evidence of a deed by proof, they being inaccessible, of the handwriting of the witnesses. If this be the correct reason for the existence of the rule, and we know of no other or better that has been assigned, there is little reason why in this day and generation it should be continued. In the onward march of civilization and of letters, man has advanced to a point where there are relatively but few who cannot now subscribe their names. The execution of a deed otherwise than by the maker subscribing his name, is the exception; formerly, it was otherwise. Under our system, a deed is a good conveyance, though it be not executed under seal, and there be no subscribing witnesses to attest its execution. The signature of the maker alone is sufficient to give it legal force as a conveyance. Therefore, whenever an issue is made upon the execution of a deed, the primary inquiry is, was it signed by the alleged maker? If it was, it is a good deed, whether its execution be attested by subscribing witnesses or not, and whether the signatures of the alleged subscribing witnesses are genuine or not.

The real question then upon the execution of a deed being as to the actual signing, the primary inquiry should be as to the fact. Let us suppose, for instance, that a registered deed is offered in evidence, and to this, an affidavit of forgery is filed; let us suppose that neither the alleged subscribing witnesses nor the alleged maker are in life; let us suppose that sufficient evidence were introduced to establish the genuineness of the handwriting of the alleged subscribing witnesses:—these facts might be proven beyond controversy, and still the deed be a forgery; for, while the persons alleged to be subscribing witnesses may have signed the paper, that does not, except by inference, connect the alleged maker with the transaction, nor otherwise establish the execution of the deed by him. If, however, on the other hand, it be shown that the alleged maker in fact signed the identical paper offered in evidence, such evidence not only establishes directly the execution of the instrument, but likewise connects the maker directly with the transaction to which it relates. In the former case, the fact of execution would be established by inference only; in the latter, by direct evidence; and who will question that a rule is purely artificial and arbitrary which makes the former of higher proof than the latter? Let us further suppose that the actual execution of the deed by the maker was capable of being proven by some witness who perchance stood present, and, though not called upon to attest his signature, in fact saw the maker sign the deed; the deed then would not be a forgery, but would be the genuine deed of the maker, and still, under the rule in question, incapable of being proven, set up or established as a genuine document, unless the absence of testimony showing the handwriting of the subscribing witnesses is first satisfactorily accounted for. Let us assume that the evidence is doubtful as to the signatures of the subscribing witnesses, but

direct and positive as to the actual execution of the instrument by the maker, who can doubt but that, in a court of justice seeking for the purest and most direct sources of information, such a deed ought to be established? The real issue being, in such cases, whether the maker in fact signed his name to the paper, the chosen witnesses should first be called to prove that fact; but if they be not in existence or be inaccessible, then the next best evidence is that which establishes most directly the point at issue, and that evidence would be either the testimony of some witness not called upon to attest the deed, but who saw the maker sign it, or evidence that the signature attached to the deed was in the actual handwriting of the maker. And yet, according to the rule under discussion, courts are required to reject such direct testimony, and submit to the jury the question as to whether or not the execution is satisfactorily proven by the inference resulting from proof of the handwriting of the alleged subscribing witnesses. The rule above indicated seems to have met with favor at the hands of the General Assembly upon the only occasion upon which, so far as we have been able to discover, that body has been called upon to deal directly with the question; for, while we find that section 2708 of the code which provides for the registration of deeds where the subscribing witnesses are dead, lunatic, removed beyond the limits of the State or otherwise incapacitated, upon the affidavit of a third person to those facts, and to the genuineness of the handwriting of the subscribing witness or witnesses, we further find, from an examination of the original acts from which this section of the code was codified, that they, both the act of December 31st, 1838, and the act of December 10th, 1841, required not only that the third person therein referred to should swear to the genuineness of the handwriting of the subscribing witnesses, but he is required also to swear to

v 96 38

the genuineness of the handwriting of the person execut-
ing the instrument. When the code was adopted, this
latter requisite was omitted, and the omission to carry
into it these pregnant provisions of a positive statute
may be fairly attributable to oversight rather than to a
deliberate purpose to repeal the law, the effect, however,
being a repeal. The original acts are referred to as in-
dicating the legislative design when the General Assem-
bly was dealing directly with the particular question we
now have under consideration. In the earlier days of
this court, it was not necessarily a matter of great con-
sequence as to what particular rule of evidence prevailed
with respect to this subject. But conditions since then
have vastly changed. Large areas of country in which
the land was comparatively valueless, have grown of
recent years to be of great value; titles in many in-
stances have been loosely preserved; and the number of
cases pending in the courts in which the issue of forgery
is made upon the execution of deeds offered in evidence
seem to suggest the importance of requiring that per-
sons offering such papers in evidence shall be held to
strict proof of their authenticity. As an abstract prin-
ciple of law, the rule in question has been always of
force in Georgia; but under sections 3838 and 3839 of
the code, which provide, in speaking of subscribing wit-
nesses, that "if the witness is not produced, or, being
produced, cannot recollect the transaction, the court may
hear any other evidence to prove its execution"; "proof
of handwriting may be resorted to in the absence of di-
rect evidence of execution," the circuit judges have been
accustomed in many instances to relax somewhat of its
severity, and, assuming that under the sections quoted,
a certain discretion was conferred upon them, in the
classification of secondary evidence, have required that
the evidence be directed to proof of the handwriting of
the maker of the instrument, rather than to the hand-

writing of the subscribing witnesses. The writer is of
the opinion, that since no better reason can be assigned
for the existence of this rule than its antiquity, and
since under conditions at present existing the reason of
the rule has long since ceased, the legislature might well
abrogate it, and substitute therefor another, less arbi-
trary, less technical, and better adjusted to our judicial
system.

2. Upon the trial of this case, the·defendant offered
in evidence what purported to be an oath of allegiance
to the United States Government, taken by Kellett·
Babb on the 18th day of September, 1865, before the
ordinary of the county of which he was then a resident.
The only evidence of the due execution and genuine-
ness of this oath of allegiance which was submitted,
was the testimony of a witness who identified the hand-
writing of the ordinary who attested the affidavit. The
paper was offered in evidence for the purpose of com-
parison of the alleged signature of Kellett Babb, as
thereon appearing, with the signature of the same per-
son alleged to have been written on the deed. The
court admitted this testimony, and to it defendant ex-
cepted, upon the ground that there was no such evidence
of the genuineness of this paper as authorized its ad-
mission in evidence. We think this objection well taken,
and that the oath of allegiance should have been ex-
cluded. The section of the code, 3840, under which
such papers are admitted, is not controlled by those to
which we have referred in the previous discussion of
this case. This paper being collateral to the main issue
only, it was not necessary, in the first instance, to call
the subscribing witnesses to prove its execution, and
therefore no presumptive evidence, under the rule we
have heretofore considered, would arise in favor of its
authenticity, resulting merely from proof of the hand-
writing of the subscribing witnesses. Where a paper

is offered for the purpose of comparison, its execution
by the maker must be either proved or acknowledged
by him. Before it could be set up as a standard by
which to judge of the genuineness of another paper, the
handwriting must be established as being that of the
alleged maker of the collateral paper. Its force as evi-
dence cannot be made dependent upon inference; be-
cause, in order to determine by comparison the identity
of makers by similarity of handwriting, it is of prime
consequence that we first establish a genuine standard;
otherwise, it would be impossible to reach even an ap-
proximately correct conclusion. . Where such a paper
so offered in evidence is directly in issue, the fact that
it was attested by a public officer might afford such in-
ferential evidence of its execution as to authorize its
admission; but the statute is imperative, that before it
can be admitted in a collateral way for the purpose of
comparison, its own genuineness must first be estab-
lished.

3. As illustrating the principle stated in the third
head-note, we content ourselves with copying portions
of the charge excepted to, and which are subject to the
criticism that they amounted to an expression or inti-
mation of opinion as to the weight of the evidence, and
as to what facts had been proven on the trial. One of
the extracts from the charge to which exception was
taken was as follows: "This is a case in which you
have to rely upon just such evidence as can be obtained,
on account of the death of persons who might know
facts. You are left to a limited source for evidence."
Whether or not the parties who might have known
facts were dead, and whether or not the source from
which evidence might be derived was limited, were ques-
tions of fact for the jury alone, and if they found these
facts to be true, they might take them into considera-
tion in determining the probative effect of the evidence

offered; and the trial judge should not anticipate their finding upon either of these questions, and express an opinion or intimate one, either as to the character or weight of the evidence submitted. The court further charged the jury: "It is contended that the deed was in the possession of old man Babb at the time of his death, and among his papers. If that is true, and you should so find, then the deed is not delivered. But you will look to the evidence and see if this is true. Mr. Jackson testifies that the first time he saw the deed was at Rebecca Babb's house; it was on the day of the appraisement; that after the estate had been appraised, Colville Babb, administrator, told Rebecca to bring him the deed, and she brought it and handed it to Colville in the presence of Mr. Jackson, and that he, Mr. Jackson, examined it and handed it back to him, Colville Babb, and he gave it back to Rebecca; so Mr. Jackson swears. Now it is contended that you may conclude from this evidence that the deed was gotten from a place where the effects of old man Babb were deposited. It is for you to say whether this is a correct conclusion, or whether another conclusion is equally or more correct. Does it prove that particular conclusion, or does it prove that Colville Babb called on Rebecca as the custodian of it to bring it out? Did he tell her where she could find it? Did he return it to her to be put back anywhere, or did he return it to her without instructions? and what does this testimony prove? That is for you to determine." Whether or not the deed was delivered was a material question in this case, and in instructing the jury upon that point, the court had no authority to thus take up and recapitulate in detail the testimony of one of the witnesses as stated in that ground of exception. In the courts of this State juries, and not judges, sum up the evidence.

*Judgment reversed.*