## CENTRAL OF GEORGIA RAILWAY COMPANY *v.* STATE OF GEORGIA.

1. If a railroad company of this State refuses to comply with an order passed by the railroad commissioners, requiring it to erect a depot building in a given town or city through which the line of its road passes, such refusal, in contemplation of law, is at the company's principal office, or place of business; and consequently the superior court of the county in which that office is located, and it alone, has jurisdiction of an action by the State against the company for the recovery of the penalty incurred by the company in refusing to yield obedience to such order.

2. The intention of the act of December 16, 1895, adopting the present Code, and making the same of force, as the Code of Georgia, is to enact into one statute all the provisions embraced in that Code.

3. This act is not unconstitutional because the various sections of the Code were not incorporated therein; nor because these sections were not read three times and on three separate days in each house of the General Assembly before the passage of the act.

4. The act in question does not, within the meaning of article 3, section 7 and paragraph 8, of the constitution of Georgia, refer to more than one subject-matter, nor does it contain matter different from what is expressed in the title thereof.

5. The effect of this act is to make a part of the law of the State all new matter embodied in the Code of 1895 which could be constitutionally enacted by the legislature. It follows, therefore, that an act, though unconstitutional as originally passed, on account of containing matter different from what was expressed in its title, if otherwise constitutional, became valid law by its incorporation in the present Code, upon the passage of the act first above mentioned.

Argued May 4,—Decided July 27, 1898.

Action for penalty. Before Judge Beck. Monroe superior court. September 9, 1897.

On January 8, 1897, the State through the attorney-general filed in Monroe superior court a petition to recover of the Central of Georgia Railway Company, a railroad corporation doing business and having an agent in Monroe county, a penalty of $5,000, alleged to have been legally incurred by disobeying and disregarding an order passed by the railroad commissioners of the State, on January 28, 1896, requiring the defendant to proceed to erect a suitable depot building at Forsyth in Monroe county, under the provisions of said order. The defendant filed a demurrer, and the overruling of the same is assigned as error. The grounds of this demurrer are as follows.

1. The petition does not show that the superior court of Monroe county has jurisdiction of this action, because the alleged violation of the order of the commission did not occur in the county of Monroe, nor was the wrong complained of perpetrated in said county, and it is not alleged that the principal office of the defendant company is in the county of Monroe.

2. The railroad commission of the State of Georgia has not the power to "require the location of depots, and the establishment of such freight and passenger buildings, as the condition of the road, the safety of freight, and the public comfort may require," and therefore the order of said commission, set forth in the third paragraph of the petition, is null and void: (1) Because the title of the act approved October 29, 1889, which purports to give to the commission the power to "require the location of such depots, and the establishment of such freight and passenger buildings, as the condition of the road, the safety of freight, and the public comfort may require," does not ex-

press what is contained in the body of said act, and for this reason said act is unconstitutional, null and void, in that it violates article 5, section 7, of the constitution of the State. (2) Because said act approved October 29, 1889, purports to amend the act approved October 14, 1879, but said amendatory act does not amend the title of the said act of 1879, thereby adding to the body of the said act of 1879, as amended, matter different from that expressed in the title thereof, to wit, that portion of the act approved October 14, 1879, as amended, which confers upon the railroad commission the power and authority to "require the location of such depots, and the establishment of such freight and passenger buildings, as the condition of the road, the safety of freight, and the public comfort may require," and to this extent said act of 1879, as amended, is unconstitutional, null and void, in that it violates article 3, section 7, paragraph 8, of the constitution. (3) Because the act of the General Assembly approved August 31, 1891, which purports to be in aid of the same power, is unconstitutional, null and void, in that it is a violation of article 3, section 7 and paragraph 8, and article 3, section 7 and paragraph 17, of the constitution of the State. (4) Because the provisions of the act approved October 14, 1879, were embodied in the Code of 1882, and the provisions of said act could not thereafter be amended except by an amendment of the Code of 1882, in the manner prescribed in article 3, section 7 and paragraph 17, of the constitution of the State of Georgia. (5) Because there is no power anywhere vested in the said railroad commission "to require the location of such depots, and the establishment of such freight and passenger buildings, as the condition of the road, the safety of freight, and the public comfort may require."

3. There is no penalty prescribed for a violation of the orders of the railroad commission with reference to the establishment of depots.

4. No notice is prescribed to the persons to be affected by the order of the railroad commission in the premises, and therefore the order of the railroad commission is null and void, being in contravention of article 1, section 1, and paragraph 3, of the constitution of the State of Georgia, and the 14th amend-

ment of the constitution of the United States, and in that it seeks to deprive the defendant of its liberty and property without due process of law.

5. The petition does not set forth any good and valid cause of action against the defendant.

Among the allegations of the petition it appears, that the violation of the law and perpetration of the wrong herein complained of was done in the county of Monroe by the defendant company, and the superior court of that county has jurisdiction of this petition by virtue of the statute in such cases provided; that the railroad company operates and controls a railroad and is engaged in the business of transporting freight thereon from one point to another within the State over the line lying within the State, and was so engaged before the date of the order of the commissioners, and has been so engaged continuously since that date, and was legally bound to obey and carry out said order; that the company had full and ample notice of the application by the citizens of Forsyth for an order requiring the erection of such depot, and the hearing of this application took place on January 28, 1896, at which hearing the defendant company was represented and was fully heard, and the commissioners after said hearing determined that the safety of freight and the public comfort required the erection of such depot, and that the condition of the defendant company was such as to justify the expenditure for the same, and thereupon passed the aforesaid order; that on the next day the company was duly served with a copy of this order, but has failed and refused to comply with the same or any part thereof, and has taken no steps looking to carrying it out; wherefore the commissioners, in pursuance of the duty imposed by law in the exercise of their discretion as prescribed, have caused this suit to be instituted in the name of the State.

*Hall & Boynton* and *Lawton & Cunningham*, for plaintiff in error. *J. M. Terrell, attorney-general*, contra.

LEWIS, J. 1. The latter part of section 2189 of the Civil Code gives the railroad commissioners power to require the location of such depots, and the establishment of such freight and

passenger buildings, as the condition of the road, the safety of freight, and the public comfort and convenience may require. This provision is contained in the act of October 29, 1889. Acts of 1889, p. 132. Under section 2196 of the Civil Code, a penalty is prescribed against any railroad company doing business in this State, for a violation of the rules and regulations fixed by the railroad commissioners. This section is a codification of section 9 of the act of October 14, 1879. Acts of 1878-9, p. 129. It appears from the record, that on January 28, 1896, the railroad commissioners of this State passed an order requiring the Central of Georgia Railway Company to erect a suitable depot building at Forsyth in Monroe county. The company refused to comply with this order, and suit was instituted by the State, through the attorney-general, in Monroe superior court, to recover the penalty provided for in the above section 2196 of the Civil Code. Unless the right to sue elsewhere is specially given by statute, suits against a railroad company of this State should be brought in the county of its principal place of business. The legislature, by special provision, in the act upon which this suit is based, has undertaken to fix the venue of such actions. Section 2196 of the Civil Code declares: "An action for the recovery of such penalty shall be in any county in the State, where such violation has occurred or wrong has been perpetrated, and shall be in the name of the State of Georgia." It is contended by counsel for the State, that the superior court of Monroe county has jurisdiction of the petition, as it appears that the violation of the rule of the railroad commissioners and the perpetration of the wrong set forth occurred in that county. It is not alleged either that this county was the principal place of business of the defendant company, or that the company had any agent or employee in that county charged either with the duty or power of erecting a depot. The wrong done in this case was a failure on the part of the company, through its principal officer, to obey the order of the railroad commissioners. It involved simply an omission of a duty. No agent in Monroe county was charged with this duty or had anything whatever to do with its performance, so far as the record shows. No disregard, therefore, of the mandates

of the railroad commissioners occurred in that county.   The wrong was perpetrated by the company through its principal officer, who failed or refused to obey the order in question. The violation, therefore, occurred in the county where the company's principal office is located, and there the wrong was perpetrated.   In *Coles* v. *Central Railroad Co.*, 82 *Ga.* 149, it appeared that the gist of the action was the refusal of the company to issue a through bill of lading over its own line to the line connecting its road with Brunswick, the latter extending from Albany to Brunswick.   The suit was brought in Dougherty county.   According to the allegations in the declaration, the refusal did not occur in that county, but in other counties.   It was held by this court, that the suit ought to have been brought either in those other counties, or in Chatham county, the residence of the defendant.   It further appeared in that case, that before the freight arrived in Albany plaintiffs notified defendant's agent that it was coming, and requested that it be transferred in the same cars from the defendant's road to the Brunswick and Western railroad, and that after the cotton arrived at Albany the same request was made, and the defendant refused to comply with the request.   Notwithstanding the issuing of the bill of lading involved work to be done by the company in Dougherty county, to wit, a transfer of the freight from one road to another there, yet this court held that this did not give Dougherty superior court jurisdiction.   So in the case we are now considering, although the work contemplated by the order of the commissioners was to be performed in Monroe county, yet the gist of the action was a refusal to obey the order, and hence the action should have been brought where such refusal took place.   In refusing to perform a duty enjoined upon railroad companies by statute, and which can only be performed by its general officers, they are presumed to act at the principal place of business of the company.   We think, therefore, that the court erred in not sustaining the first ground of the demurrer to the petition.

2. It is contended by counsel for plaintiff in error, that there is no law in the State which confers upon the railroad commission the power and authority to require a railroad company

to erect depot buildings; that the act which undertakes to con-
fer this power, to wit, the act approved October 29, 1889,
amendatory of the act of 1879, is unconstitutional, because it
contains matter different from what is expressed in the title
thereof; and that the act approved August 31, 1891, which
undertook to remove the defect in the title of the act of 1879,
is itself unconstitutional, because its title does not indicate the
matter contained in the body of the act. On the other hand
it is contended by counsel for the State, that, the act of 1889
being codified as section 2189 of the new Code, the act of 1895
adopting and making of force that Code cured whatever de-
fects, if any, which had existed in the act of 1889. Counsel
for plaintiff in error insists, however, that by the adopting act
of 1895, the legislature never intended to make anything in
the Code law which was not the law before its adoption, and
that even if such was its intention, it did not have the power
under the constitution to enact in this way new statutes, or any
changes or modifications in the existing laws of the State. We
will not pause to consider or pass upon the questions raised in
reference to the constitutionality of the acts of 1889 and 1891
as originally passed by the legislature, but we will pass over
these to consider the more important question as to what va-
lidity or force the adopting act of the legislature gave to the
provisions in the present Code of 1895. Upon this issue was
fought the great legal battle between counsel for the contend-
ing parties in this case; and the view we take of this question,
which can scarcely be measured in its importance and interest
to the profession and the people generally, renders it unneces-
sary to consider the other constitutional questions touching de-
fects in the titles of the original acts. It is insisted that by the
act approved December 19, 1893, providing for the appoint-
ment of three commissioners to codify the laws of Georgia, these
commissioners were simply empowered to codify and arrange
in systematic and condensed form the laws then in force in the
State, and had no authority whatever to embody in the Code
any new law or any provision which modified any existing law
of the State. No one would pretend that any new matter in
the Code derives force or efficacy by virtue of the act of the

commissioners alone.    Even if the legislature had attempted to confer upon the commissioners the power to make changes in the law, and to embody in the Code such new matter as they saw proper, such an act of the legislature, in so far as its purpose was to thus create new legislation for the State, would have been an absolute nullity.    Enacting and changing laws for a State devolves by the constitution upon the legislative branch of its government, and that branch can not delegate the power to another.    A consideration, therefore, of the duties and powers imposed upon the code commissioners can throw no light upon what construction should be given an act of the legislature adopting their work.    If the codifiers introduced any new matter in the Code, it of course amounted to nothing unless it afterwards was enacted into statute by legislative sanction.    Where such matter is not inherently unconstitutional, that is, where it embraces nothing that is not a proper subject-matter of legislative enactment, there can be no question that the legislature has the power to enact it into law or not, as it sees proper.    When the work of the commissioners was completed, it was laid before the legislature.    It had the power to reject that work or to accept it, and in its acceptance it had the power simply to provide for the pay of the commissioners and the publication of their work for the use of the public; and if nothing more was done, there would have been a want of legislative sanction to any new matter embodied in the Code, and hence such new matter would never have had any validity.

The vital question, then, in this case is, not what the commissioners had the power to do, but what the legislature intended to do with their work.    That intention can only be gathered from what the legislature itself declared when it finally passed upon the work reported to it by the commissioners. This final action of the legislature is embodied in what is known as the "adopting act" of the Code, approved December 16, 1895. Section I of that act declares, "That the Code of laws prepared under its authority by John L. Hopkins, Clifford Anderson, and Joseph R. Lamar, and revised, fully examined, and identified by the certificate of its joint committee, and recommended

and reported for adoption, and with the acts passed by the General Assembly of 1895 added thereto by the codifiers, be, and the same is, hereby adopted and made of force as the Code of Georgia." This portion of the body of the act is covered by these words in the title: "An act to approve, adopt, and make of force the Code of laws prepared under the direction and by authority of the General Assembly," etc. A legislative body should always be presumed to mean something by the passage of an act. If, as contended by plaintiff in error, the legislature by this act intended to adopt such provisions in this Code as were law anyway without any further legislative sanction whatever, then the act in question is absolutely meaningless. It would give no more force or effect to the Code of 1895 than such a work would have carried with it emanating from a private source, and without any legislative warrant or authority whatever. The Code of laws designated and identified in the act was adopted and made of force as the Code of Georgia; not a part of the Code was then made of force, but the entire Code as compiled by the commissioners. It would be difficult to conceive how language could more clearly or forcibly express the real intent of the legislature in this matter than the words used in the title and body of this act. If it means anything, it means a purpose of the legislature to adopt and make of force a code of laws, and hence to breathe into every provision in that Code the vitality of a legislative enactment. Any other construction would ascribe to the legislature the folly of declaring, in effect, we adopt as law in this code everything which would be law anyway without further sanction. It would be just as reasonable for that body to re-enact verbatim et literatim a statute which it recognized and knew to be already of force. Had such been the legislative will, that body would doubtless have pursued the same course with reference to the Code of 1895 that its predecessors followed in regard to the Codes of 1868, 1873, and 1882. The Code of 1868, known as Irwin's Code, and also the Code of 1873, were both the work of private enterprise, their compilation not having been previously authorized by any act of the legislature. The Code of 1882 was compiled in pursuance of an act of the legislature, but

neither this edition nor the other two named received the sanction of an adopting act. After each of these works was completed, it was by resolution of the General Assembly submitted, the first to a committee of three, and the last two to the attorney-general of the State, and each received favorable reports. This was a completion of the work, and all the legislature afterwards did was to order a publication of a given number of volumes and make appropriation therefor. When, however, the Code of 1895 was reported by the commissioners, and was examined, approved, and favorably reported by a joint committee of both houses of the legislature, that body went a step further and passed the "adopting act" of 1895. Instead of treating the work as it did the three preceding editions, it pursued the same course followed by the legislature when it passed the act of December 19, 1860, adopting and making of force what has ever since been known as the Code of 1863. There is a remarkable similarity between the words used in the title and body of that act, and those employed in the act of December 16, 1895. The title of the former was, "An act to approve, adopt, and make of force, in the State of Georgia, a revised Code of laws, prepared under the direction and by authority of the General Assembly thereof; and for other purposes therewith connected." The title of the latter was, "An act to approve, adopt, and make of force the Code of laws prepared under the direction and by authority of the General Assembly, to provide for the printing and publication of the same, and for making indices thereto, and for other purposes." In the body of the former act it was declared that the Code designated "is hereby adopted as the Code of Georgia; to be of force and take effect on the first of January, 1862." By a subsequent act of the legislature this time was extended to January 1, 1863. In the body of the act of 1895 it was declared that the Code mentioned "be, and the same is, hereby adopted and made of force as the Code of Georgia."

In the light of the numerous decisions of this court, some of which are hereinafter referred to, there can be no question as to what was the intent of such language in the act of 1860; the legislative purpose being to enact into law every provision con-

tained in the Code, including such new matter as was introduced, as well as such changes and modifications as were clearly made in existing laws. The power conferred upon the first Code commissioners by the act of December 9, 1858, was no greater than that conferred by the act of December 19, 1893, providing for the present Code. In the former act it was provided that the commissioners should "prepare for the people of Georgia a Code, which should, as near as practicable, embrace, in a condensed form, the laws of Georgia, whether derived from the common law, the constitutions, the statutes of the State, the decisions of the Supreme Court, or the statutes of England of force in this State." In the act of 1893 power was conferred upon the commissioners "to codify and arrange in systematic and condensed form the laws now in force in Georgia, from whatever source derived." The commissioners had no more authority to make changes in the law in one instance than they had in the other. It therefore follows that the effect of an adopting act can not be measured by the powers with which the codifiers were clothed in the original act of the legislature, which was the first step toward providing a Code. Even if the position taken by counsel for plaintiff in error be correct, that it was the constitution of 1865 that first gave the Code of 1863 vitality and force as a legislative enactment, this will not help them out of the difficulty of their position. That constitution, so far as it bears upon the subject, simply declares of force in this State "all laws declared of force by an act of the General Assembly of this State, assented to December 19, A. D. eighteen hundred and sixty, entitled 'An act to approve, adopt, and make of force in the State of Georgia, a revised Code of laws,' etc." The constitution itself, therefore, refers only to such provisions in the Code as *were declared to be of force by the adopting act of 1860.* This necessarily carries us back to the terms of that act, and involves the question as to what laws it *intended to declare of force.* There is quite a difference between a Code of laws for a State and a compilation in revised form of its statutes. The Code is broader in its scope and more comprehensive in its purpose. Its general object is to embody as nearly as practicable all the law of a State, from whatever source derived. When prop-

erly adopted by the lawmaking power of a State, it has the same effect as one general act of the legislature containing all the provisions embraced in the volume that is thus adopted. It is more than evidentiary of the law; it is the law itself. In 6 Am. & Eng. Enc. L. (2d ed.) 173, it is declared: "The word [Code] is used frequently in the United States to signify a concise, comprehensive, systematic re-enactment of the law, deduced from both its principal sources, the pre-existing statutes, and the adjudications of courts, as distinguished from compilations of statute law only." We quote the following from Black on Interpretation of Laws, 363: "Although a code or revision may be made up of many provisions drawn from various sources, though it may include the whole or parts of many previous laws and reject many others in whole or in part, though it may change or modify the existing law, or though it may add to the body of law previously in force many new provisions, yet it is to be considered as one homogeneous whole, established 'uno flatu.' All its various parts or sections are to be considered and interpreted as if they were parts of a single statute. And hence, according to a well-known rule, the various provisions, if apparently conflicting, must, if possible, be brought into harmony and agreement. In order to bring about this harmony and agreement, the court which is called upon to interpret the code will look through the entire work, and gather such assistance as may be afforded by a complete survey of it." Whenever the legislature, therefore, employs such words as "adopting a code," no other legitimate or reasonable construction can be given the language itself than an intention to enact and make of force as a statute every provision in the entire work which it has under consideration. Such being the intention of the legislature by the adopting act of 1895, it remains to be considered whether or not this purpose has been legally and constitutionally declared.

3. The present constitution of this State, art. 3, sec. 7, par. 7 (Civil Code, § 5770), declares that "Every bill, before it shall pass, shall be read three times, and on three separate days, in each house, unless in cases of actual invasion or insurrection." One attack made upon the adopting act is, that it does not con-

tain in its body any of the various provisions of the law which it seeks to declare of force, and that under the constitutional provision above cited, it was necessary that these provisions should have been embodied in the act, and should have been read three times before their passage. If this contention be correct, then a large body of our laws, many of which have been enforced for a century, are unconstitutional and void. The act of 1782 revived the colonial statutes by mere reference and without embodying them in the act itself. The act of 1784 adopted the common law of England. These laws were passed under a constitution which required bills to be read three times in the house and twice in the council, and the common law not only was not so read, but very few if any of the legislators knew of all its provisions. The Code of 1863, § 1, par. 6, went further than the original adopting act of 1784, and made parts of the civil and canon law of force in this State. By virtue of section 3945 of the present Code, "equity jurisprudence embraces the same matters of jurisdiction and modes of remedy in Georgia as was allowed and practiced in England." This was simply an adoption of such jurisdiction and modes by mere reference. The New York percentage-table for calculating reinsurance, the American Experience or Actuaries' Table of Mortality, and Stern's Calendar are thus adopted by acts codified in sections 2045, 2049 and 5169 of the Civil Code. Similar instances might be multiplied to such an extent as to show that a tremendous breach, if not a total wreckage of our system of laws would be accomplished if the judicial construction contended for in this case were placed upon the constitutional provision above quoted. By the act of February 25, 1875 (Acts 1875, p. 162), a charter was granted to the town of Douglasville simply by adopting by reference sections 774 to 797 of the Code of 1873. In *Ayeridge* v. *Social Circle*, 60 *Ga.* 404, these sections were declared to be unconstitutional; yet this court held in *Town of Douglasville* v. *Johns*, 62 *Ga.* 423, that the above act of 1875 incorporating these unconstitutional provisions by reference was valid. On page 427, Justice Jackson, delivering the opinion, says: "The legislature might have taken them from an English book or from a newspaper and engrafted them on the charter; when it did so, it became law to this town and all its citizens."

In *Loan Asso.* v. *Richards*, 21 *Ga.* 592, it was held that an act of the legislature incorporating a company by its constitution and by-laws, without embodying the same in the act, was constitutional and valid. On page 613, Lumpkin, J., delivering the opinion, said: "Suppose the legislature were to adopt the Bible as a part of the law of the land. Would the act be void, unless the whole of the Old and New Testament were embodied in the statute? Suppose it were to declare that the Levitical degrees as set forth in the Old Testament should fix the relationship within which marriage might or might not be contracted. Or suppose it were to say, that Mr. Greenleaf's Treatise on Evidence should be the guide of the courts in settling the rules of testimony. It is needless to multiply illustrations. The position is untenable and impracticable; our legislature has by one sweeping act declared the whole of the ordinances of one of our cities valid and of binding force. These ordinances fill a volume of some five hundred pages, and yet it is probable that not one of them was read, certainly not one of them is inserted in the amendatory act. . . Set aside this charter, and you eviscerate the digests and statute-books of the State. Nay, more; you annul, unquestionably, the adopting act of 1784, and with it go the common and statute law of England, heretofore of force in this State." This point as to the constitutionality of an act thus adopting a code was practically made and decided by the Supreme Court of Alabama in Dew v. Cunningham, 28 Ala. 466, and also by the Supreme Court of Florida in Mathis v. State, 12 So. Rep. 681 et seq. Mabry, J., who delivered the opinion in the last case, on page 686, after citing the case of Dew v. Cunningham, supra, says: "In this case it was contended that the Code of Statutory Laws then recently adopted by the legislature was not in force, because, at the time of its adoption, it was not read upon three several days in each house of the General Assembly, and that it had not the style required by the legislature. The constitution then in force in that State provided that "no bill shall have the force of law until, on three several days, it be read in each house, and free discussion had thereon," and the style of all laws shall be, "Be it enacted by the Senate and House of Representatives

of the State of Alabama, in General Assembly convened." The Code was held in this case to have been constitutionally enacted, although not embodied in the bill adopting it.　Walker, J., said in his opinion: "We do not understand this to mean that everything which is to become a law by the adoption of the bill must be read on three several days.　Such a construction is not warranted by the language of the constitution.　Our legislative annals afford many instances of the adoption, by one comprehensive enactment, of large masses of law, which were never read on three several days in both branches of the legislature." See also Ex parte Thomas, Supreme Court of Ala., 21 So. Rep. 369 et seq.

4. It is further contended by counsel for plaintiff in error, that the adopting act of 1895, if given the construction we have placed upon it, is violative of art. 3, sec. 7, par. 8, of the constitution (Civil Code, § 5771), which declares that "No law or ordinance shall pass which refers to more than one subject-matter, or contains matter different from what is expressed in the title thereof."　This presents the only question in the case which, to our minds, is at all difficult of solution.　An act adopting a code necessarily, in one sense, refers to a great many subjects, and enacts into statute provisions not germane one to another.　We have, however, after much reflection, thought and research, reached the conclusion that the position of the able counsel of plaintiff in error is founded upon a misconception of the real meaning and purpose of the provision in the constitution above quoted.　This constitutional restriction pro-† hibiting the passage of any law containing matter different from what is expressed in its title originated in this State, and grew out of a memorable event in its history.　The act of January 17, 1795, known as the Yazoo act, had for its purpose, as its title declared, "payment of the late State troops" and "protection and support of its frontier settlements."　The body of the act made a large grant of land to a private company of speculators; and when the fraud was discovered, it gave rise to a long and bitter controversy between the leaders of different parties and factions in the State.　*Mayor etc.* v. *State*, 4 *Ga.* 38; *Howell* v. *State*, 71 *Ga.* 227.　The manifest purpose, then, of this pro-

vision in the constitution was to prevent a repetition of such a fraud.   Its object, therefore, was not to prevent comprehensive, but surreptitious legislation.   The other provision, that no bill shall contain more than one subject-matter, does not appear in the constitution of 1798, but has since become a part of our constitutional law.   Its object was not so much to prevent surreptitious legislation, as to inhibit the passage of what is often termed "omnibus" or "log-rolling" bills.   A bill may contain more than one subject, and yet, if its title clearly indicates all its subjects, it will not be apt to mislead the legislature as to its intent and scope, and can not, therefore, be considered surreptitious legislation.   Experience, however, taught that it was often the case that many matters were embraced in the same bill, adverse in their nature and having no necessary connection, with the view of combining in their favor the advocates of all, and thus securing the passage of several measures no one of which could succeed upon its own merits.   It was to prevent this dangerous practice that our organic law declares that a bill should contain but one subject-matter.   An act, however, adopting a code, or a system of laws, obviously does not fall within any of the classes of mischiefs which this restriction in the constitution was intended to remedy.   No one need be misled by a title to an act which declares that its purpose is to adopt a certain code, or system of laws; nor is there anything in such an act to occasion any alarm that it would pass contrary to the wishes of the people by virtue of improper combinations among members of the legislature.   What the constitution looks to is unity of purpose.   It does not mean by one subject-matter only such subjects as are so simple that they can not be subdivided into topics; but it matters not how many subdivisions there may thus exist in a statute or how many different topics it may embrace, yet if they all can be included under one general comprehensive subject which can be clearly indicated by a comprehensive title, such matter can be constitutionally embodied in a single act of the legislature.   On the other hand, should the legislature embody in one act two or more different subjects, however simple they may be, which have no relation or connection whatever one with the other, the constitution is violated.

The following very apt illustration has been suggested to this court: "You can, in one act, charter Greater New York, with its millions, and embrace therein an endless variety of legislation concerning Police, Streets, Wharves, Courts, Jails, Mayor, Council, Tax-Collecting, Tax-Assessing, Legislative and Executive functions, but you can not in the same act charter two small villages like High Shoals and Belton." See *King* v. *Banks*, 61 *Ga.* 20.

The Code of 1863 was not the first Code that ever went into effect in Georgia. In Lamar's Digest on page 1098 we find a resolution of the legislature, approved December 16, 1811, appointing a joint committee on the Criminal Code, "with power to add to and enlarge the extent of articles embraced by the Code now reported, and further to recommend such alterations in that Code as they may deem necessary." On page 540 of this work begins the Penal Code of 1811, adopted by an act with the title, "To ameliorate the Criminal Code, and conform the same to the Penitentiary System." On page 564 begins the Penal Code of 1816, adopted by an act with the title, "To reform the Penal Code of this State, and to adapt the same to the Penitentiary System." That Code embraces 46 pages of that large volume. On page 611 of the same book begins the Penal Code of 1817, adopted under the title of an act "To amend the Penal Code of this State," embracing 44 pages of that volume. These Penal Codes treat of the various criminal offenses against the laws of the State, define them, provide for their punishment, etc. Offenders have been deprived of life and liberty under these penal laws. For years were they enforced by the courts as they stood in the Penal Codes, and we are not aware of any case where it was even suggested that there was anything in the body of the act different from what was expressed in the comprehensive titles above quoted. Under the repeated rulings of this court in numerous cases, the Code of 1863 has been given vitality and force by virtue of the adopting act of 1860. In *Shumate* v. *Williams*, 34 *Ga.* 249, it was referred to as "The Code, begun in 1859, finished and adopted in 1860," and it was further recognized in the same case that it introduced numerous changes in the old law. In

*Bass* v. *Ware*, 34 *Ga.* 387, it was declared that the Code went into effect January 1, 1863. In *Bryan* v. *Doolittle*, 38 *Ga.* 258, it was said, "That Code, however, did not take effect until the first day of January, 1863." In *Georgia R. Co.* v. *Oaks*, 52 *Ga.* 414, it was stated, "The Code was adopted as the law of the State, upon the matters included in it, by the legislature, on the 19th of December, 1860, to take effect on the 1st of January, 1862, which date was afterwards changed to 1st January, 1863, when it became the law of the State." In *Kennedy* v. *McCardel*, 88 *Ga.* 454, it was decided that after the Code went into effect on January 1, 1863, it repealed the old law which allowed the clerk of an inferior court to be the official attesting witness to a deed. In *Banks* v. *Sloat*, 69 *Ga.* 333, it is said, " decree . . was rendered in February, 1862, nearly a year before the Code took effect." In *Lewis* v. *Turner*, 40 *Ga.* 418, it was declared that " The Code was adopted in 1860, and went into effect 1st January, 1863." From the facts in that case it will be seen that, in order to make the Western & Atlantic Railroad liable in the pending suit, it was necessary that the action should have been brought after the adoption of the Code. The suit was brought in 1861. The court held that this was within the time prescribed by the statute, as the Code was adopted by the legislative act of 1860. If, as contended by counsel for plaintiff in error in this case, the Code did not go into effect until the adoption of the constitution of 1865, that decision was manifestly wrong. If the first Code went into effect on January 1, 1863, it was necessarily by virtue of the legislative act of 1860, and not by virtue of the constitution of 1865, which did not go into effect until November 7th of that year. It is passing strange, if the contention of plaintiff in error be correct, that it never occurred to this court, in the consideration of all the cases we have cited, as well as many others of like import, that the Code of 1863 did not go into effect on the first day of January of that year, but on November 7, 1865.

Apart from these decisions, we think the learned counsel have entirely misconceived the purpose of the constitution of 1865 in its allusions to and treatment of the Code. Article 5, section 5, of that constitution simply declares what laws of gen-

eral operation were then of force in this State. They were, first, as the supreme law, the constitution of the United States; second, as next in authority thereto, the constitution of the State; third, in subordination to the foregoing, all laws *declared of force* by the act of the General Assembly of December 16, 1861, and December 13, 1862, adopting the Code and making it of force from and after January 1, 1863, and also acts of the General Assembly passed since the date last written. It can not, of course, be claimed that this section in the State constitution made the constitution of the United States the supreme law of the land. It was not the intention of the constitutional convention to enact statutes, but simply to recognize such as were then in existence. The purpose of such a recognition becomes patent when we reflect upon the political condition of this country at the time. The State had just emerged from the civil war. It was passing through the period of reconstruction. Its laws, to which reference was made in the constitution, were mainly adopted during the period of secession when the State was a member of the Southern Confederacy. Apprehension, doubt, and anxiety existed in the minds of many as to what effect this changed condition of affairs would have upon legislation enacted through that stormy period. To quiet these doubts and allay these fears, the people in convention assembled declared in the constitution of their State what laws they recognized as being still valid and of binding effect. As was stated by this court in *Smith* v. *Ordinary*, 44 *Ga.* 504, "That portion of the constitution of 1868, which confirms and makes valid the acts of the legislature of 1865 and 1866, was only intended to quiet doubt, and was not necessary to give them validity." The question, however, we are now discussing has never before been directly made in this court. But even if we regard these decisions declaring, in effect, that the Code became of force by virtue of an act of the legislature, as mere obiter, they still deserve some weight even as authority. If they did not correctly announce the law, then the frequent repetition by different members of the same court of an erroneous dictum on the same subject is certainly without a parallel in the history of any judiciary. In our research upon this subject we have been una-

ble to find any authority, in this State or elsewhere, tending to hold, or even suggesting, that an act of the legislature adopting a system of laws is obnoxious to a constitutional provision prohibiting the passage of any bill containing more than one subject-matter. The contrary view is supported by abundant authorities, some of which we will now cite. Cooley, in his excellent work on Constitutional Limitations (5th ed.) *144 (p.174), declares: "The generality of a title is therefore no objection to it, so long as it is not made a cover to legislation incongruous in itself, and which by no fair intendment can be considered as having a necessary or proper connection. The legislature must determine for itself how broad and comprehensive shall be the object of a statute, and how much particularity shall be employed in the title in defining it."

The constitution of the State of Minnesota provides, that "no law shall embrace more than one subject, which shall be expressed in the title." In Johnson *v.* Harrison, 47 Minn. 575, it was decided that an act entitled "An act to establish a Probate Code." was not obnoxious to this constitutional provision. It appears that the act establishing this Code in Minnesota embraced 21 subchapters, containing 326 sections. The legislature adopted in the form of one act a complete system of statutory law relating to those matters over which probate courts have jurisdiction, namely, estates of deceased persons, and of persons under guardianship. In Ex parte Thomas, 113 Ala. 4, 21 So. Rep. 369–70, it is declared: "A code or body or system of law, adopted or enacted by a single act of the General Assembly, though it may contain inconsistent or repugnant provisions, or one section or part may be modified, and, to the extent of the modification, controlled, by another, is not within the letter or spirit of the mandate of the constitution. It is not within the legislative evil it is designed to remove, nor can it be supposed that it was within the contemplation of the framers of the constitution. Though, for convenience, the Code is published in two volumes, the one pertaining entirely to that which may be termed 'civil,' and the other to that which may be termed 'criminal' legislation, it was adopted by a single act entitled 'An act to adopt a Code of laws for the State of Ala-

bama.'" It is true the constitution of Alabama authorized the adoption of a code by the legislature, but the constitution of Alabama nevertheless required that the subject should be described in the title; and Brickell, C. J., in that case quoted the following from Walker, C. J., in Ex parte Pollard, 40 Ala. 98: "The constitution requires that only one subject should be embraced, and that it should be described in the title. 'Subject' is a very indefinite word. A phrase may state the subject in a very general or indefinite manner, or with minute particularity. The subject of laws with such titles as the following, 'To adopt a penal code,' 'To adopt the common law of England in part,' 'To adopt a code of laws,' 'To ratify the by-laws of a corporation,' would be expressed in a very general way, and very little knowledge of the specific provisions of the laws could be gleaned from the title; yet it would nevertheless be true that the subject was described in the title." See Bales v. State, 63 Ala. 30–34; Dew v. Cunningham, 28 Ala. 466; Hoover v. State, 59 Ala. 57.

The constitution of the State of Washington provides that "No bill shall embrace more than one subject, and that shall be expressed in the title." In the case of Marston v. Humes, 3 Wash. 267, it was held that the Code of 1881 of that State was a valid and binding body of laws, arranged and consecutively sectionized under authority of the legislature of 1881 from laws revised and re-enacted by that body, and ratified by subsequent legislatures by constant reference thereto as the Code of 1881. On page 276 the court says: "If the legislature can thus by a name sufficiently comprehensive embrace all the subjects properly relating to civil procedure, it must follow that by adopting a subject sufficiently general it can embrace in one act all the statute law of the State. In other words, the legislature may adopt just as comprehensive a title as it sees fit, and if such title when taken by itself relates to a unified subject or object, it is good, however much such unified subject is capable of division." There is a like restriction in the constitution of West Virginia against the passage of laws containing more than one subject, and containing matter different from what is expressed in the title. In State v. Mines, 38 W. Va. 139, it was said: "It can

not be doubted that under the title of the act passed in 1868, establishing a Code of laws, it was valid to insert" in that Code a named section.   The present constitution of Texas allows only one subject-matter in an act.   Its revised statutes were adopted by an act entitled "An act to adopt and establish the Revised Civil Statutes of the State of Texas."   In McLane v. Paschal, 28 S. W. Rep. 711, the Court of Civil Appeals of Texas decided that this act passed in 1879 was a legal and constitutional enactment.   In Van Horn v. State, 46 Neb. 62, it was declared: "The object  .  .  of the constitution, providing that 'no bill shall contain more than one subject, and the same shall be clearly expressed in its title,' is to prevent surreptitious legislation.   If a bill has but one general object, no matter how broad that object may be, and contains no matter not germane thereto, and the title fairly expresses the subject of the bill, it does not violate this provision of the constitution."   On page 74 of the same case the court says:   "We conceive the rule to be that the constitutional provision does not restrict the legislature in the scope of legislation.   It does not prohibit comprehensive acts, and no matter how wide the field of legislation the subject is single so long as the act has but a single main purpose and object.   Thus, we would have no doubt of the power of the legislature by a single act to provide a new and complete Code of' Civil Procedure," etc.   Other authorities might be cited with like import, but these are quite sufficient to show the trend of judicial decision upon the subject.   Our conclusion therefore is, both upon reason and authority, that the act of December 16, 1895, contains but one subject, which is clearly embraced in the title of the act.   That subject is the adoption of a Code of' laws for Georgia.   Though comprehensive and of vast extent in its range, it nevertheless preserves the constitutional principle of unity.   While all the various sections of the Code are not germane one to the other when considered separately, yet taken together they are directly connected with and relate to this great subject and constitute one system of laws for the State.

5. It is further contended by plaintiff in error, that the embodiment in the Code of an unconstitutional law is an error which the legislature did not intend to sanction by its act adopt-

ing the Code. If the infirmity of the act relates to matter upon which the constitution prohibits any legislation at all, of course the act would be void, it matters not where found, nor how often adopted. Where, however, the defect is not inherent in the subject-matter itself, but relates simply to its manner of passage under a defective title, it is, of course, permissible for the legislature to re-enact the measure under a proper title. If the act of 1889 in question, empowering railroad commissioners to require railroad companies to erect depots, was unconstitutional as originally passed, because its title did not indicate what was in its body, it simply amounted to no law, and was just as if there had never been any attempt to legislate upon the subject. Such matter afterwards embraced in the Code duly adopted is like any other new matter contained therein, and has force and effect from the time of the adoption of the Code. The changes made in the Code of 1863 are perhaps much more numerous than was at first supposed. Many of these modify previous statutes by omitting a portion of their provisions. Others altered the statutes by adding thereto, while others contained entirely new matter emanating from the brains of the codifiers, and not found either in the common or statute law. Yet all these alterations and additions have been treated by this court in its numerous decisions relating thereto as valid law. See *Railroad Co.* v. *Johnson*, 38 *Ga.* 433; *Phillips* v. *Solomon*, 42 *Ga.* 196; *Gardner* v. *Moore*, 51 *Ga.* 269; *Miller* v. *S. W. Railroad Co.*, 55 *Ga.* 144; *Georgia Railroad* v. *Kirkpatrick*, 35 *Ga.* 144; *Georgia Railroad* v. *Ivey*, 73 *Ga.* 499–500–506; *Watson* v. *Swann*, 83 *Ga.* 200; *Verdery* v. *Dotterer*, 69 *Ga.* 197–8; *Adams* v. *Barlow*, 69 *Ga.* 302–8; *Banks* v. *Sloat*, 69 *Ga.* 333; *Freeman* v. *Cherry*, 46 *Ga.* 18; *Ewing* v. *Shropshire*, 80 *Ga.* 380; *Ellis* v. *Darden*, 86 *Ga.* 370–1; *McVicker* v. *Conkle*, 96 *Ga.* 593–4. In *Huff* v. *Markham*, 70 *Ga.* 285, it was held that an act, though unconstitutional on account of containing matter in its body different from what was expressed in its title, became valid law, after it was incorporated in Irwin's Code as the statute law of the State, and after that body of law had been recognized both by the constitution of 1868 and 1877. In *Bales* v. *State*, 63 Ala. 34, it was decided that a Code "may

embrace statutes not originally enacted in the forms prescribed by the constitution; and if that be true, they are valid, not from the day of their original enactment, but from the day the Code became operative."

We have not overlooked, in the consideration of this case, those decisions and dicta of this court to the effect that it was not intended to adopt as law every inaccuracy or error that may have crept into the Code.    On this point our attention has been especially called to the following cases: *City of Atlanta* v. *Gas Co.*, 71 *Ga.* 106; *McDaniel* v. *Campbell*, 78 *Ga.* 188; *Jemmerson* v. *State*, 80 *Ga.* 111; *Hardeman* v. *McManus*, 82 *Ga.* 20. All these cases relate to the effect of the adoption or recognition by the constitution of 1868 of Irwin's Code.    As before seen, this Code was never adopted by an act of the legislature, but what force it had as a Code of laws grew out of its recognition by the constitution of 1868.    Every one of the cases above cited relates to an omission or error in Irwin's Code touching a provision in some act of the General Assembly passed in 1866. But the constitution of 1868 no more adopted or recognized that Code as law than it did every act of the General Assembly passed since 1861.  · Hence Justice Jackson, in *McDaniel* v. *Campbell*, 78 *Ga.* 189–190, above cited, says: "But it is argued that the Code of 1868 uses 'or' instead of 'and,' and that the constitution of 1868 makes that code law.    The answer is, that it makes acts passed since 1861 also law.    So that the act of 1866 has the *imprimatur* of the constitution of 1868 as fully as Irwin's Code has.    The codifier had no right to alter the act of 1866, and the constitution of 1868 does not ratify such alteration, but by making that code valid, it makes it so only so far as it consists with acts passed since 1861, which are also made valid."    But in any view we take of these decisions on the subject of palpable errors and inadvertent mistakes made by the codifiers, they do not bear upon the particular question now being considered. As above seen, if the act involved in this case, authorizing the railroad commissioners to compel the erection of depots by railroad companies, was never law before it was incorporated in the Code, on account of a constitutional defect in its title, then it is entirely new matter in the Code, purposely put there, and does

not get there by inadvertence or mistake. It has always been held that where new matter is embraced in the Code, it becomes the law of the State the moment the Code goes into effect.

We have treated the constitutional questions involved in this case at considerable length, on account of their vast importance and interest to the public generally. Laws should be made as certain as practicable, and should be so published, if possible, as to enable every citizen readily to find where they are and what they declare. This great need in all civilized governments has never been so successfully met by any system as one which undertakes to codify in a systematic, condensed, yet clear and comprehensive form, the laws of a State. Georgia perhaps had, when her Code of 1863 went into effect, the most perfect system of codified laws then existing in any country on the globe. Mr. Cobb deserves the chief credit for this great work of systematizing and condensing the statute and common law of Georgia in one volume. While the changes in the law made by this codification were probably more numerous than was at first supposed, yet these changes generally, instead of marring the symmetry or detracting from the splendor of our system of laws, add to its luster and its excellence. In the main they still exist. Their wisdom has been indorsed by two generations. Executives have honored them by their observance in the execution of the laws. Legislatures have respected them by refusing to repeal or modify their provisions. Courts have recognized them by repeatedly enforcing them in the administration of justice. They have been handed down from Code to Code, and still live in the present Code a monument to the legal learning and ability of their author, and to the genius of his masterly intellect. Yet these changes were never vitalized into life and power until the legislature, in its wisdom, adopted them as a part of the statute law of the State. What changes have occurred in the new Code of 1895 have likewise been thus adopted, and they should receive at the hands of the judiciary the same respect and consideration as any other act of the legislative department of the State.

We think the court did right in overruling all the grounds of the demurrer, except the first. We reverse the judgment

for not sustaining the demurrer on the ground alone that Monroe superior court did not have jurisdiction of this cause of action.        *Judgment reversed.   All the Justices concurring.*

NOTE.—Knowing that the Hon. Jos. R. Lamar was one of the codifiers of the Code of 1895, and had doubtless given some of the matters involved in this case consideration, we requested of him his views touching the constitutional questions raised.   To this he generously responded by furnishing us with an able and thorough brief, which has been of great assistance to us in this work.