# APRIL, 1946

R. G. DUDDING ET UX V. AUTOMATIC GAS COMPANY.

No. A-721. Decided March 20, 1946.
Rehearing overruled April 24, 1946.
(193 S. W., 2d Series, 517.)

2

*Mayo W. Neyland* and *J. Benton Morgan,* both of Greenville, for petitioners.

Since the Legislature by the enactment of Article 6053a, Vernon's Statutes, did not authorize the Railroad Commission to pass upon the locations of Butane Gas reservoirs, or whether such reservoirs constituted a nuisance as to property rights of adjacent property owners in that these are questions for judicial determination only, any attempt of the Railroad Commission to read such authority into said act and the amendments thereto is unconstitutional. McKnight v. Pecos & Toyah Lake Irr. Co., 207 S. W. 599; Stockwell v. State, 110 Texas 550, 221 S. W. 932; Stephenson v. Wood, 35 S. W. (2d) 794.

Since there was abundant evidence to show that butane gas was highly explosive and dangerous to health, the court was warranted in finding that under all the evidence offered that same constituted a nuisance and properly granted plaintiff's petition for a temporary injunction. Whittemore v. Baxter Laundry Co., 181 Mich. 564, 148 N. W. 437; Comminge v. Stevenson, 76 Texas 642, 13 S. W. 556; 22 Am. Jur. 158.

*Rollins & McWhirter* and *A. S. Rollins, all* of Greenville, for respondents.

The act of the Legislature providing for the storage of butane gas stipulated that all containers and pertinent equipment for that purpose shall be designed, constructed, etc., as specified under the published regulations of the National Board of Fire Underwriters in a pamphlet No. 58, a copy of which was on file with the gas utilities division of the Railroad Commission, and such pamphlet became a part of the act and is the standard provided by the Legislature and the courts will take judicial knowledge of its contents the same as if it were published in the act itself. Brown v. Humble Oil & Refining Co., 126 Texas 296, 83 S. W. (2d) 935, 99 A. L. R. 1107; West Texas Compress and Warehouse Co. v. Panhandle & S. F. Ry. Co., 15 S. W. (2d) 558.

JUSTICE SIMPSON delivered the opinion of the Court.

Petitioners sued in the district court of Hunt County to restrain respondent from erecting and maintaining storage tanks for butane gas near petitioners' residence in a suburb of Greenville. The tanks, which were in process of erection when the suit was filed, were 128 feet from petitioners' residence and 127 feet from the nearest building. The combined capacity of the two tanks respondent intended to erect was 18,400 water gallons. Upon hearing without a jury, the trial court granted a temporary injunction, the findings of the court reciting that the storage of the proposed quantity of butane gas "at the place and under the circumstances is a continuing menace to the life and property of the plaintiffs" and to others, and that "the location and amount of explosive, to be stored, under the surrounding conditions and circumstances, creates both a private and public nuisance."

The Court of Civil Appeals reversed the judgment of the trial court and rendered judgment for appellant (respondent here), holding in effect that one engaging in a business in compliance with lawful rules made pursuant to legislative authority is protected in the use of his property and that such a legalized business and use cannot be declared a nuisance by a court. 189 S. W. (2d) 780.

The case is before this Court solely on the question of the propriety of issuing an injunction to restrain the proposed construction of respondent's tanks.

In their argument petitioners affirm that "there is only one matter involved in this case and that is as to the location of the 20,000 gallon butane gas tanks, and whether located as they were, they constitute a nuisance."

It is not disputed that the respondent is enaged in a lawful business and has fully complied with all applicable rules and statutes, except only it is urged that the regulatory powers contained in the act from which we will presently quote do not extend to an approval of the location of respondent's tanks. Accordingly, our inquiry narrows to a consideration of the regulations which assume to permit the location of these tanks within certain minimum distances from adjoining and near-by property.

In 1939 the Legislature passed a comprehensive regulatory statute to prevent the improper handling and use of liquefied petroleum gases, which enactment included the following:

"After the effective date of this Act all containers and pertinent equipment installed for use in this State for the storage and dispensing of liquefied petroleum gases for the purpose of providing gas for industrial, commercial, and domestic uses, shall be designed, constructed, equipped, and installed as specified under the published regulations of the National Board of Fire Underwriters for the design, installation, and construction of containers and pertinent equipment for the storage and handling of liquefied petroleum gases as recommended by the National Fire Protection Association, effective July, 1937, a copy of said regulations known as National Board of Fire Underwriters Pamphlet No. 58 being on file with the Gas Utilities Division of the Railroad Commission of Texas." Sec. 2a, Art. 6053, as amended Acts 1939, 46th Leg., p. 501 (Sec. 2a, Art. 6053a, Vernon's Rev. Tex. Stat.).

Pamphlet No. 58, adverted to in the act, includes the following regulation:

"B.5 Location of Containers and Regulating Valves.

(a) * * * Except as herein provided, each individual container shall be located with respect to nearest important building or group of buildings or line of adjoining property which may be built upon in accordance with the following table:

| | Minimum Distance | |
|---|---|---|
| Water Capacity Per Container | Underground | Aboveground |
| Less than 125 gallons | 10 feet | None |
| 125 to 500 gallons | 10 feet | 10 feet |
| 500 to 1200 gallons | 25 feet | 25 feet |
| Over 1200 gallons | 50 feet | 50 feet |

Aboveground containers of capacity exceeding those shown in the above table may be installed close to buildings or property lines when specifically approved by the inspection department having jurisdiction."

The Railroad Commission of Texas was designated as the agency to administer this act. It promulgates rules which substantially conform to the statutory standards. These rules include a provision that the particular containers which respondent proposes to erect "shall be located and installed in accordance with specific approval obtained from the Railroad Commission of Texas." This approval was obtained. Moreover, the tanks were located substantially farther than the minimum of fifty feet from near-by structures, which as we have seen was expressly approved as a criterion by the Legislature itself.

Manifestly, one of the many factors which concerned the law-makers in enacting this statute was the location and spacing of tanks for the storage of butane gas, and by its adoption of this pamphlet the Legislature effectively laid down definite standards as to spacing. The respondent has fully complied with these standards as well as with the rules of the Railroad Commission.

■ It was entirely proper for the Legislature to adopt, for the guidance of the Railroad Commission in administering the act, standards theretofore prescribed by the National Board of Fire Underwriters. Nor is the statue invalid because the standards thus adopted were not copied into the act but were incorporated into it by reference to a document then on file with the administering agency. Ex parte Gerino, 143 Cal. 412, 77 Pac. 166, 66 L. R. A. 249; State of Washington v. Bonham, 93 Wash. 489, 161 Pac. 377, L. R. A. 1917D, p. 996; Gima v. Hudson Coal Co., 106 Pa. Super. 288, 161 Atl. 903, affirmed 310 Pa. 480, 165 Atl. 850. The very first article of our Revised Statutes adopts by reference the common law of England and we apprehend that none would question its validity. Interestingly in point is an observation of the Supreme Court of Georgia in Central of Georgia Railway Co. v. State, 104 Ga. 831, 31 S. E. 531 where the court was considering the validity of an adoption act putting into effect a recodification of the statute laws of Georgia. The point had been urged that the measure was invalid because the new code was not copied at length into the act adopting it, and hence offended against the constitutional provision requiring that before final passage bills should be read in each house of the Legislature on three several days. After calling attention to Georgia's statutory adoption by reference of (1) the common law of England, (2) the equity jurisprudence in force in that country, and (3) the American experience table of mortality, the court observed:

"Similar instances might be multiplied to such an extent as to show that a tremendous breach, if not a total wreckage, of our system of laws, would be accomplished if the judicial construction contended for in this case were placed upon the constitutional provision above quoted."

Also illustrative of the constitutional power of a state legislature to enact such a measure as is here under consideration, we quote the following from L. A. Thompson Scenic Railway Company v. McCabe, 211 Mich. 133, 178 N. W. 662, in which the Supreme Court of Michigan made a distinction between the

scope of the legislative powers of the City Council of Detroit and those of the Michigan Legislature:

"Reliance is placed by the defendant upon Act No. 174 of the Public Acts of 1917, by means of which it is said, the State Legislature adopted the 'Boiler Code of the American Society of Mechanical Engineers' by reference only. The propriety of this method of legislation has never been questioned, so far as we are advised; but, assuming its entire constitutionality, it should be borne in mind that the Legislature of the state functions under broad constitutional limitations, whereas the common council of the city of Detroit must act strictly within the powers granted to it in the character."

The adoption of the regulations in question is not open to such an objection as was urged in State v. Crawford, 104 Kan. 141, 177 Pac. 360, 2 A. L. R. 880, a criminal case where a statute adopting present as well as prospective rules of an unofficial association as a standard of conduct, departure from which would be punished as a crime, was held invalid. It is true that the 1939 enactment also authorized (but did not require) the Railroad Commission of Texas "to adopt and promulgate such rules and regulations as may be hereinafter adopted and published by the National Board of Fire Underwriters and/or the National Fire Protective Association" for the handling of liquefied petroleum gases. But the matter of adopting future rules is not in this case. What we are now considering is the validity of that set of rules which was adopted by the lawmakers when they gave legislative sanction to Pamphlet No. 58 from which we have quoted. We do not have before us a situation where future rules of an unofficial agency have been prospectively adopted by the Legislature or the Railroad Commission. To the contrary, we have here a document containing comprehensive regulations for the safe handling of liquefied petroleum gases which was on file among the archives of the Railroad Commission, and which the statute expressly approved. The adoption of these rules in this manner was certainly a valid exercise of legislative power.

■ It follows from what has been said that the installations which respondent proposes to construct have been effectively legalized, and accordingly their erection could not have been abated as a nuisance. The applicable rule is well put in 39 Am. Jur., p. 478. We quote:

"Generally, the courts will not hold conduct to constitute a nuisance where authority therefor exists by virtue of legisla-

tive enactment, and there are numerous statements in the cases to the effect that the doing of that which the law authorizes cannot be a nuisance, or such a nuisance as to give a common-law right of action, although it would otherwise be one. It has also been held that when the legislature directs or allows that to be done which would otherwise be a nuisance, it will be valid on the ground that the legislature is ordinarily the proper judge of what the public good requires, unless carried to such an extent that it can fairly be said to be an unwholesome and unreasonable law."

Essentially the same thing is said in Joyce on Nuisances, sec. 69, p. 108:

"* * * And the rule may be stated to be that where one has the sanction of the State for what he does unless he commits a fault in the manner of doing it, he is completely justified, provided the legislature has the constitutional power to act. And the legislature may, except so far as it may be limited by constitutional restrictions, when deemed necessary for the public good, permit or require that to be done which would, on common law principles, and without the statute be deemed a nuisance."

Many decisions support these views. Among them are Ferris v. Wilbur (C. C. A. 4th), 27 Fed. (2d) 262; Atchison T. & S. F. Ry. Co. v. Armstrong, 71 Kan. 366, 80 Pac. 978, 1 L. R. A. (N. S.) 113, 114 Am. St. Rep. 474; Levin v. Goodwin, 191 Mass. 341, 77 N. E. 718; Strachan v. Beacon Oil Co., 251 Mass. 479, 146 N. E. 787; Ex parte Pierotti, 43 Nev. 243, 184 Pac. 209; and E. I. Du Pont de Nemours Powder Co. v. Dodson, 49 Okla. 58, 150 Pac. 1085. See also Sherman Gas and Electric Co. v. Belden, 103 Texas 59, 123 S. W. 119, and Neblett v. Sterling Investment Co. (Tex. Civ. App.), 233 S. W. 604 (error ref.).

■ The suggestion has been made in conference that there is no proof that the Railroad Commission has ever given approval to the location of respondent's tanks. This point was not raised by petitioners. They only complain that the approval of the Commission was not obtained until after suit was filed. Respondent introduced in evidence a telegram from the director of the Gas Utilities Division of the Railroad Commission of Texas giving "tenative approval" of the location. Other than suggesting that the approval was tardily obtained, a position we consider untenable, the petitioners have made no objection to the form or adequacy of this proof. The evidence indicated that final approval by the Commission would be forthcoming after the

completion and official inspection of the respondent's installations, the erection of which was interrupted by the trial court's restraining order. Under the circumstances, approval of the location of respondent's tanks by the administering agency was sufficiency shown.

Petitioners rely on Rainey v. Red River T. & S. Ry. Co., 99 Texas 276, 89 S. W. 768, 3 L. R. A. (N. S.) 590, and Burrows v. Texas & N. O. Ry. Co. (Tex. Civ. App.), 54 S. W. (2d) 1090 (error dism.), to support the contention that installations otherwise legalized by statute may not be erected and maintained at a place where a court finds the location amounts to a nuisance unless the statute pointed out the place where the objectionable structure was to be built or left that location to the arbitrary selection of those erecting it. In neither of these cases was there involved legislation dealing with the matter of location. The court in each case took pains to point out the absence of such a statute. Indeed, in each case it is indicated that if the structure in question had been located at a place authorized by statute, no injunction to abate its maintenance would lie. In the present case, the manner in which butane storage tanks must be located has been defined and authorized both by statute and by the agency designated to administer the act. The Rainey and Burrows cases are patently not in point.

■ Complaint is made in effect that the Railroad Commission of Texas is undertaking to adjudicate the rights of the parties. We cannot give assent to this contention. Obviously the Legislature has no facility through which to administer the workings of the butane gas regulatory act. What the lawmakers did was to delegate to the Railroad Commission this task and to charge that agency with the duty of putting into effect the statute's completed provisions. There was no attempt to delegate to the Commission any judicial power, nor has that body in any sense undertaken to adjudicate the property rights of the parties. All it has done in this case is to undertake its statutory duty of administering the act. This was entirely proper. Housing Authority of City of Dallas v. Higginbotham, 135 Texas 158, 143 S. W. (2d) 79, 130 A. L. R. 1053, and cases there cited.

We conclude that the judgment of the Court of Civil Appeals should be affirmed.

Opinion delivered March 20, 1946.

Rehearing overruled April 24, 1946.

JUSTICE SMEDLEY dissenting.

I respectfully dissent from the majority opinion herein for the reasons hereinafter stated. The record presents or suggests many interesting questions, but I shall discuss only three conclusions reached after careful consideration of the record and the briefs.

One of these is that the statute upon which the majority opinion is based does not by its terms or even by implication relate to or provide for the *location* of containers or tanks for the storage of butane gas; it does not authorize the Railroad Commission to fix their location; and it does not lay down a standard for their location. Second, if the statute does deal with the location of such tanks, it does so only by reference to a pamphlet issued by the National Board of Fire Underwriters, which cannot be valid legislation. Third, there is no proof in the record that the Railroad Commission has ever given specific final approval to the location of respondent's tanks.

Consideration of the foregoing conclusions and of the effect of this Court's decision as reflected by the majority opinion seems to require a statement of the trial court's findings and order and of the important facts.

Petitioners' home, which they have owned and occupied since 1923, is situated in a suburb of the city of Greenville, a community of homes on an important highway. The respondent, Automatic Gas Company, is engaged in the business of storing, transporting and marketing butane gas, owning twelve distributing stations. Without having obtained the Railroad Commission's approval of the location and disregarding a petition of eleven of those residing nearby, respondent procured a lease of a tract of land for the location of bulk storage tanks, built the foundations for two tanks, and had installed one of them when this suit for injunction was filed. The capacity of the tank installed is 8400 water gallons and of the other tank about to be installed 10,000 gallons, making the total capacity of the two tanks 18,400 gallons. Respondent intends to remove and sell the gas from the tanks to supply Hunt County and parts of several counties within a radius of thirty or forty miles from Greenville. The location of the tanks is 128 feet from petitioners' residence.

This suit was filed and the restraining order was issued on May 5, 1945. The order for temporary injunction from which the appeal was taken was made on June 2, 1945. On May 19, 1945, two weeks after the suit was filed and the restraining

order issued, the Director of Gas Utilities of the Railroad Commission sent respondent, Automatic Gas Company, a telegram stating that "On basis specifications shown your drawing indicating property on west to be 100 feet removed from storage tanks when installed, our tentative approval is herewith given your proposal to install LPG bulk storage containers on Highway No. 67 near Greenville, Texas." This telegram is the only proof made of approval of the location. No action by the Commission itself is shown and no final approval by anyone.

The temporary injunction restraining respondent from installing the tanks and filling them with butane gas was issued after full hearing. The court's order contains findings of fact which are supported by the evidence in the statement of facts. It describes the business in which respondent is engaged, that is, the business of buying butane gas in liquid form and transporting the same by motor tanks to control points where it is stored and then taken in smaller tanks for delivery to customers. The order contains the finding that "the defendant, without any authority from any legal source, but on their own volition, leased the following tract of land," describing it; and it proceeds to make the following findings:

"And which lot of land lies adjoining and East of the plaintiffs' home and at the intersection of two paved highways on which a large amount of traffic is passing day and night; that the said tract of land is located in a thickly settled part of Hunt County, and is surrounded by a number of residences in which families live in close proximity thereto; that the defendant began the construction of a foundation at a point on said lot of land 128 feet East of plaintiffs' residence and within 100 feet of each of said public highways; that the foundation so constructed was to accommodate two steel tanks, which would have an aggregate storage capacity of more than 18,400 gallons of liquid Butane Gas; that they had completed said foundation and had installed one of the tanks with a capacity of 8600 gallons and were in process of installing another tank of greater capacity, and that the defendant was preparing to install the second tank and to store therein more than 18,400 gallons of liquid Butane Gas when the temporary restraining order stopped further proceedings.

"That the point where the defendant is building and constructing said storage tanks as herein stated is a residential district. The evidence further disclosed that the defendant transports Butane Gas in liquid form and forces the same from the motor tanks into the stationary tanks, and that the stationary tanks

when filled with Butane Gas is under a pressure of from 80 to 100 pounds to the square inch; that trucks bringing in the liquid Butan Gas and the trucks taking it away, operate both day and night, and the filling of the tanks is done by hose from the rolling tanks to the stationary tanks, and the taking of the gas from the stationary tanks to the rolling tanks is done by hose under pressure.

"The evidence further disclosed that when Butane Gas in its liquid form is released that it immediately converts into a vapor or gas, which is heavier than air, and which gas by volume increases, in accordance with the evidence shown, 750 times, and quickly spreads over a large territory, and hovers near the ground, seeking lower places, and when it comes in contact with a spark of fire explodes and will destroy all human life and property which it comes in contact with over the area which it covers. * * *

"From the facts as presented to the court it is the opinion of the court and the court so finds that the storage of such large quantity of Butane Gas at the place and under the circumstances is a continuing menace to the life and property of the Plaintiffs, and to the residence and homes immediately surrounding said location, and that it is a continuing menace to the public traveling over the highways adjacent thereto, and that the location and amount of explosive, to be stored, under the surrounding conditions and circumstances, creates both a private and public nuisance, and it is the opinion of the court that the temporary injunction applied for by the plaintiffs should be granted, and defendant restrained from completing the installation of said tanks and filling them with Butane Gas. * *."

The Court of Civil Appeals, in reversing the trial court's judgment, held that the injunction should not have been issued "for the reason that the Railroad Commission, clothed with full authority by the Legislature, has approved the proposed location." 189 S. W. (2d) 780, 782. The majority opinion of this Court rests upon the conclusions that the statute lays down definite standards for the location and spacing of storage tanks for butane gas, that the Railroad Commission was authorized to make and did make rules on the subject, which conform to the statutory standards, and that specific approval was obtained from the Railroad Commission for the location of these tanks.

We discuss first the conclusion expressed in the majority opinion that the statute prescribes standards for the location and spacing of tanks for the storage of butane gas. The statute

relied upon by respondent and quoted in part in the majority opinion is Section 2a of Article 6053, as rewritten in House Bill 792, appearing on pages 501-507, Acts Regular Session, 46th Legislature. That section provides that "all containers and pertinent equipment installed for use in this State for the storage and dispensing of liquefied petroleum gases * * * shall be *designed, constructed, equipped* and *installed* as specified under published regulations of the National Board of Fire Underwriters for the design, installation and construction of containers and pertinent equipment for the storage and handing of liquefied petroleum gases * * *, a copy of said regulations known as National Board of Fire Underwriters Pamphlet No. 58 being on file with the Gas Utilities Division of the Railroad Commission of Texas." (Emphasis supplied).

In the next paragraph of Section 2a it is provided that the Railroad Commission shall have full power and authority to adopt and promulgate such rules and regulations "as may be hereinafter adopted and published by the National Board of Fire Underwriters * * for the design, installation, construction and operation of containers and equipment used in connection with the storage, handling and dispensing of liquefied petroleum gases."

It is to be observed that the statute makes no reference whatever to the *location* of containers or tanks, does not undertake to provide where tanks shall be located in relation to existing improvements, does not undertake to authorize the Rail-Road Commission or any other body or person to approve or designate locations for tanks. If the statute can prescribe standards by its reference to rules and regulations of the National Board of Fire Underwriters as contained in its Pamphlet No. 58, it prescribes standards only for design, construction, equipment and installation. There is no reference to rules or regulations for location. The statute deals with designing, constructing, equipping and installing tanks and not with the location of them. The words "design, construct, equip and install" have to do with the method and manner of planning and building the tanks, putting them together and setting them up, so that they will be well constructed and sound and as safe as possible from leakage and explosion. The ordinary meaning of the word "install" is to set up or fix in position for use or service. 21 Words and Phrases, (Permanent Edition) pp. 651-652. One employed to install or authorize to install is not empowered by reason of that employment or authority to designate a place for the installation. The word, when used in

connection with the words "design, construct and equip" certainly has reference to the manner of constructing tanks and setting them up for use or service and not to the selection of a place for their location.

The selection and approval of the location for tanks of great capacity for the storage and distribution of the highly explosive butane gas directly affects the property rights and safety of those who own property or reside in close proximity to the site. The statute, therefore, is not to be construed as regulating the location of such tanks, or as conferring upon an administrative body authority to pass upon and approve their location, unless an intention on the part of the Legislature to do so is clearly shown by the language of the statute. Certainly no such intention is shown. Furthermore, if the Legislature had intended to authorize the Railroad Commission or any other administrative body to pass upon and approve the location of such tanks, and thus to give lawful sanction for their location as held by the majority opinion, provision would have been made in the statute for notice to owners of nearby property, for hearing and for judicial review of the order of approval. The statute, Article 6053, as amended by the Act of the 46th Legislature, contains no such provisions. Provisions in Section 2b for notices and hearings and judicial review apply only to proceedings against licensees for the revocation or suspension of their licenses; and Section 4 requires notice of hearings, before the adoption and promulgation of orders, rules and regulations affecting the industry, to be given only to licensees.

If the subject of the location of containers or tanks is treated anywhere or in any way by the statute, it is only in a part of Pamphlet No. 58, to which the statute refers. A copy of Section B-5 of the pamphlet appears in the statement of facts. It sets out certain minimum distances for the location of containers with respect to "nearest important building." The statute in its Section 2a provides that containers for storage of the gas "shall be designed, equipped, constructed and installed as specified under the published regulations of the National Board of Fire Underwriters * * *, a copy of said regulations known as National Board of Underwriters Pamphlet No. 58 being on file with the Gas Utilities Division of the Railroad Commission of Texas." Thus the statute undertakes by reference to make the regulations contained in pamphlet No. 58 the law of the State without setting out any of the regulations.

Legislation by reference to existing statutes has generally been recognized as valid. Quinlan v. Houston & T. C. Ry. Co.,

89 Texas 356, 371-372, 34 S. W. 738; Trimmer v. Carlton, 116 Texas 572, 579, 296 S. W. 1070; 50 Am. Jur. pp. 57-59, Secs. 36- 39, 59 C. J. pp. 609-610, Sec. 165. But of course legislation by reference to regulations contained in a pamphlet published by a board of fire underwriters is something quite different. In Road District No. 1, Jefferson County, Texas v. Grover Sellers, Attorney General, 142 Texas 528, 533, 180 S. W. (2d) 138, this Court, discussing legislation by reference to other statutes, quoted with approval a paragraph from a Wisconsin decision, which concludes with this sentence: "People are obliged to obey the laws, and, in order that they may do so, they should be put in a position where they can ascertain what they are." A citizen should have quick and certain access to the written laws of his state so that he may know how to order his conduct. He has that quick and certain access when the laws are to be found in volumes officially published. He does not have it if the law is to be found in pamphlets not even published under the state's direction and that he may not be able to find. See Dockery v. State, 93 Texas Crim. Rep., 220, 247 S. W. 508.

State of Kansas v. Crawford, 104 Kansas 141, 177 Pac. 360, 2 A. L. R. 880, is very closely in point, although the decision turns in part on the question of delegation of power. The decision condemned and held void an act of the legislature providing that all electric wiring should be in accordance with the national electric code. The court said: "The laws of this state to which our people owe obedience must be officially published * * *. If the legislature desires to adopt a rule of the national electric code as a law of this state, it should copy that rule, and give it a title and an enacting clause, and pass it through the senate and the house of representatives by a constitutional majority, and give the governor a chance to approve or veto it, and then hand it over to the secretary of state for publication."

In L. A. Thompson Scenic Railway Company v. McCabe, 211 Mich. 133, 178 N. W. 662, the court held invalid an ordinance of the city of Detroit which undertook by reference to adopt a building code, a book on file with the city clerk. The book had not been enacted into legislation and had not been ordained by the common council, and accordingly the court decided that it was neither a public record nor a statute, but "was, in a legal sense, a fugitive paper 'in the custody of the city clerk'."

The authorities cited in the majority opinion to sustain this legislation by reference are not directly in point. Two of them involve statutes that adopted certain standards of educational

qualifications for those seeking to be licensed to practice medicine. The Georgia case cited and quoted, Central of Georgia Ry. Co. v. State, 104 Ga. 831, 31 S. E. 531, held valid an act of the legislature that adopted and put into effect a codification of the laws of Georgia which had been prepared and published under the direction and by the authority of an act of the legislature. None of the cases cited approves a legislative act like that here under consideration which, as construed in the majority opinion, makes lawful the construction and maintenance of structures and a business that directly and seriously affects and impair existing property and endanger persons residing near the property, and which in itself makes no regulations and prescribes no standards for regulatory action and provides for no notice and no hearing, but merely by reference undertakes to enact as regulatory law rules set out in a pamphlet published by an unofficial board. The laws to which a citizen of this state owes obedience should be enacted by the legislature and officially published. He should not be required to seek them out in "a fugitive paper."

The second paragraph of Section 2a is the only part of the statute that undertakes to authorize the Railroad Commission of Texas to make regulations pertaining to containers for butane gas. It provides that the Commission shall have authority "to adopt and promulgate such rules and regulations as may be hereinafter adopted and published by the National Board of Fire Underwriters * * * for the design, installation, construction and operation of containers, etc." It gives the Commission no authority to make rules and regulations, but only to adopt those that may in the future be promulgated by the board of fire underwriters. Such legislation is generally condemned as an unconstitutional delegation of legislative power. Hutchins v. Mayo, 143 Fla. 707, 197 So. 495, 133 A. L. R. 394, and Note pp. 401-405; City of Tucson v. Stewart, 45 Ariz. 36, 40 Pac. (2d) 72, 82, 96 A. L. R. 1492.

The legislation, in so far as the question of location of containers or tanks is concerned, comes to this: (1) The statute does not of itself and by its terms either regulate the location of tanks or prescribe a standard for their location. (2) If the statute even undertakes to treat the subject of location of tanks, it does so only by reference to a pamphlet issued by a board of underwriters. (3) The statute confers no authority on the Railroad Commission to make regulations as to the construction, etc., of tanks, except that it authorizes the Commission to adopt such regulations as the board of fire underwriters may publish in the future. It follows that Rainey v. Red River T. & S. Ry. Co., 99 Texas 276, 89 S. W. 768, 3 L. R. A. (N. S.) 590, and Burrows v.

Texas & N. O. Ry. Co., 54 S. W. (2d) 1090, cited in the majority opinion, are applicable to this case and should control its decision.

There is no proof in the record of specific and final approval by the Railroad Commission of the location of respondent's tanks. Section B-5 of pamphlet 58 sets out minimum distances from "nearest important building" for the location of underground and aboveground containers as follows: capacity up to 500 gallons, ten feet; 500 to 1200 gallons, twenty-five feet; "over 1200 gallons, fifty feet." This is followed by the statement: "Aboveground containers of capacity exceeding those shown in the above table may be installed close to building or property lines when specifically approved by the inspection department having jurisdiction." Section B-5 rules and regulations of the Railroad Commission sets out the same minimum distances except that it provides that the distance for both underground and aboveground tanks of 1201 to 2000 gallons capacity shall be fifty feet, and that containers of capacity exceeding 2000 gallons "shall be located and installed in accordance with specific approval obtained from the Railroad Commission of Texas."

Thus neither pamphlet 58 nor Section B-5 of the Commission rules sets out a minimum distance for the location of tanks of the great capacity of respondent's tanks. Both require that specific approval be obtained for their location. The majority opin- states that the tanks were located substantially farther than the minimum of fifty feet from nearby structures, which "was expressly approved as a criterion by the legislature." The legislature has prescribed no minimum distance. If effect could be given to the reference to pamphlet 58, the reasonable construction of its peculiar and contradictory provisions above quoted is that the location of aboveground containers of much greater capacity than 1200 gallons must have specific approval.

As has been said, the record contains no proof of approval of the location of respondent's tanks except a telegram to respondent from the Director of the Gas Utilities Division of the Railroad Commission stating in substance that on the basis of respondent's drawing tentative approval is given for the location of the tanks. The telegram was sent fourteen days after the filing of this suit and fourteen days after the issuance of the restraining order herein. There is no evidence showing what drawing was submitted by respondent to the Director of the Gas Utilities Division. The approval given by him is only tentative. There is no evidence that the Railroad Commission itself ever authorized the telegram or acted upon an application for approval of the

location. Does this amount to proof of specific approval of the location of the tanks by the Railroad Commission, sufficient to make the location lawful and to cut off judicial inquiry as to how and to what extent petitioners' property and safety are and will be affected by the location and operation of the tanks?

It is suggested that since the appeal is from an order issuing a temporary injunction this Court's decision reversing that order is not decisive of petitioners' right to permanent injunction after trial on the merits, and is not decisive of the question whether petitioners may or may not recover damages on account of the location of the tanks. But the majority opinion holds that the statute deals with the question of location, that the standards set out in pamphlet No. 58 are in effect statutory standards, and that the tanks have been located according to those standards under specific approval by the Railroad Commission. It is those conclusions that in the majority opinion make the location of the tanks lawful, give the sanction of the state to the location, and defeat petitioners' application for temporary injunction. If they were correct, the same conclusions would completely defeat the petition for permanent injunction and would also completely defeat a suit for damages on account of the location of the tanks.

Chief Justice Alexander and Associate Justice Taylor concurring.

Opinion delivered March 20, 1946.