

# Office of the Attorney General
## State of Texas

**DAN MORALES**
ATTORNEY GENERAL

March 29, 1993

Mr. David J. Freeman
Executive Secretary
Texas Racing Commission
P.O. Box 12080
Austin, Texas 78711-2080

Opinion No. DM-211

Re: Authority of the Texas Racing Commission pursuant to sections 6.09 and 10.05 of the Texas Racing Act, article 179e, V.T.C.S., to receive and regulate the use of breakage generated by pari-mutuel wagering on greyhounds (RQ-230)

Dear Mr. Freeman:

The Texas Racing Act (the "act") authorizes the Texas Racing Commission (the "commission") to regulate pari-mutuel wagering in the state of Texas. *See, e.g.,* V.T.C.S. art. 179e, § 3.02. Your questions concern the authority of the commission under sections 6.09(d) and 10.05 of the act to receive and regulate the use of breakage generated by pari-mutuel wagering on greyhound races in Texas. "Breakage" means:

> the odd cents by which the amount payable on each dollar wagered exceeds a multiple of 10 cents, except in the event a minus pool occurs, in which case the breakage shall be in multiples of five cents.

*Id.* § 1.03(20).[1]

Section 6.09(c) provides that 50 percent of the breakage generated by pari-mutuel wagering on greyhound races is due the state and paid to the commission,[2] while section 6.09(d) of the act allocates the remaining 50 percent. Section 6.09(d) provides:

> Fifty percent of the breakage is to be paid to the appropriate state greyhound breeding registry. Of that portion of the breakage

---

[1]For instance, a payoff of $2.27 would be rounded down to $2.20, and the odd seven cents would not be paid to the winning bettors, but distributed to the commission, the Comptroller of Public Accounts, or various other individuals or entities in accordance with the act. *See* V.T.C.S. art. 179e, §§ 6.08(h) - (j), 6.09(c) - (d), 9.04, 10.05; 16 T.A.C. § 301.1 (defining "minus pool" as a pool with insufficient net proceeds to pay the minimum price to winning bettors); THE TRUTH ABOUT HORSE RACING IN TEXAS, at 8-9, 42 (Huntington Pub. Co. 1978).

[2]*See also* V.T.C.S. art. 179e, § 3.09(a) (provision for deposit in state treasury by commission of moneys it collects under the act).

25 percent of that breakage is to be used in stakes races[3] and 25 percent of that *total* breakage *from a live pari-mutuel pool or a simulcast pari-mutuel pool is to be paid to the commission for the use by the state greyhound breed registry, subject to rules promulgated by the commission.* [Emphasis and footnote added.]

We understand you to ask what part of that 50 percent is to be paid directly to the Texas Greyhound Association (the "TGA"), the only breed registry for greyhounds in Texas. We understand you also to ask what part of that breakage is to be used for stakes races and what part is subject to rules adopted by the commission. We conclude that all of the breakage allocated by section 6.09(d) is to be paid first to the commission rather than to the TGA. We also conclude that one-half of the breakage allocated by section 6.09(d), or 25 percent, is to be used for stakes races and that the TGA's use of the 25 percent set aside for stakes races as well as its use of the remaining 25 percent is subject to rules adopted by the commission.

In 1991, the legislature added the language of section 6.09(d) italicized above. Acts 1991, 72d Leg., ch. 386, § 30, at 1456. Specifically, the senate added the italicized language during the third reading of House Bill 2263 on May 18, 1991. S.J. of Tex., 72d Leg., at 1717-18 (May 18, 1991) (floor amendment 16). Earlier that day, the senate added sections 10.04 and 10.05 to the act during the second reading of the bill. *Id.* at 1703 (floor amendment 3). Those sections provide:

Section 10.04. The state greyhound breed registry shall make reasonable rules to establish the qualifications of accredited Texas-bred greyhounds to promote, develop, and improve the breeding of greyhounds in this state. Rules adopted by the registry are subject to commission approval.

Section 10.05. The officially designated state greyhound breed registry for accredited Texas-bred greyhounds is the Texas Greyhound Association. The state breed registry shall adopt rules to provide for the use of breakage received by it under Section 6.09(d) of this Act. An association shall pay the breakage due the breed registry to the appropriate state greyhound registry at least every 30 days.

---

[3]The term "stakes" is defined by the commission's rules as "the fees paid by the subscribers to an added money or stakes race." The rules in turn define "subscription" as "money paid to nominate, enter, or start a horse or greyhound in a stakes race." 16 T.A.C. § 301.1. We understand that subscription fees are distributed in the elimination rounds in a greyhound stakes race in which all participants are Texas bred greyhounds, while breakage is distributed in the final round of such a race. *See* TEXAS GREYHOUND ASSOCIATION, RULES AND REGULATIONS FOR THE ACCREDITED TEXAS BRED GREYHOUND AWARDS PROGRAM. We are advised that restricting stakes races to races in which all participants are Texas bred greyhounds encourages the development of the Texas greyhound breeding industry.

V.T.C.S. art. 179e, §§ 10.04 - .05; Acts 1991, 72d Leg., ch. 386, § 48, at 1460.[4]  The reference to "association" in the last sentence in section 10.05 is not to the TGA, but to the individual or entity licensed to conduct races at a particular track.  V.T.C.S. art. 179e, § 1.03(2) (defining "association" as person licensed to conduct race meetings with pari-mutuel wagering).

You note in your request letter that section 6.09(d) as currently worded is subject to differing interpretations.  You explain that the commission interprets the section as setting aside for stakes races or subjecting to commission regulation the entire 50 percent of the breakage allocated by section 6.09(d), with one-half of that amount or 25 percent to be used in stakes races and the other one-half or 25 percent to be used by the TGA in accordance with commission rules.[5]  You further explain, however, that the section could be read to set aside for stakes races or subject to commission regulation only one-half of the 50 percent of the breakage, or 25 percent, with 12 1/2 percent set aside for use in stakes races and 12 1/2 percent to be used by the TGA in accordance with commission rules.  Under that interpretation, the TGA would receive the remaining 25 percent free of either statutory or regulatory control.  You state, however, that this interpretation could result in the use of breakage inconsistent with the purposes of the act, which includes the

---

[4]As adopted in 1986, the act did not designate the "appropriate state greyhound registry."  The commission by rule, however, designated the TGA as the official breed registry for greyhounds.  16 T.A.C. § 303.101 - .102 (also adopting by reference rules of the TGA regarding the administration of the Texas Bred Incentive Program for greyhounds and noting availability of copy of such rules at the commission's office).

[5]Prior to its amendment in 1991 and as originally enacted by Senate Bill 15 in 1986, section 6.09(d) provided:

> Fifty percent of the breakage is to be paid to the appropriate state greyhound registry.  Of that portion of the breakage 25 percent of that breakage is to be used in stakes races and 25 percent of that breakage is to be used for administration and accredited Texas bred-races.

Acts 1986, 69th Leg., 2d C.S., ch. 19, § 1, at 61.  This language was added during the third reading of Senate Bill 15 in the senate.  S.J. of Tex., 69th Leg., 2d C.S. at 166 (August 26, 1986) (floor amendment 4).  Neither the senate debate during third reading, earlier versions of section 6.09(d), nor other aspects of the legislative history of Senate Bill 15 clarify the meaning of the enacted language.  See, e.g., Senate Comm. Substitute for S.B. 15, Bill File, 69th Leg., 2d C.S. and House Research Daily Floor Report on C.S.S.B. 15, at 6 (August 28, 1986) (incorrectly referring to section 6.09(d) and (e) in the Senate Committee Substitute replaced by section 6.09(d) during third reading).  We understand that the commission disbursed to the TGA $182,275, or one-half of the $364,550 in breakage that the commission received from greyhound track associations for fiscal year 1991.

promotion of the greyhound breeding industry in Texas. *See id.* § 1.02 (stating act's purposes).[6]

We note also several other ambiguities in section 6.09(d). First, the phrase "subject to rules promulgated by the commission" could be construed to apply to both percentages mentioned in the second sentence, or to apply to only the latter of the two percentages. Second, the requirement that 25 percent be paid to the commission appears to conflict with the requirement that the full 50 percent of the breakage is to be paid to the TGA, the state greyhound breed registry. Furthermore, the requirement in section 6.09(d) that 25 percent be paid to the commission appears to conflict with the requirement in section 10.05 that the greyhound associations pay to the TGA breakage due it at least every 30 days.

Texas courts state that the primary purpose of statutory construction is to ascertain the intent of the legislature and that ambiguous statutes should be interpreted to accomplish the legislature's intent even if that intent is inconsistent with a strict literal or grammatical reading of the statute. *See Green v. State,* 773 S.W.2d 816, 818 (Tex. App.--San Antonio 1989, no writ); 67 TEX. JUR. 3d *Statutes* §§ 91, 113 (and authorities cited therein). Accordingly, we turn to the legislative history of the phrase "is to be paid to the commission for the use by the state greyhound registry, subject to rules promulgated by the commission."

As mentioned earlier, the senate added that phrase during the third reading of House Bill 2263 on adoption of floor amendment 16. S.J. of Tex., 72d Leg., at 1717-18 (May 18, 1991). Adoption of floor amendment 16 resulted in termination of Senator John Leedom's filibuster on the floor against passage of House Bill 2263. During the filibuster, the senator referred numerous times to section 6.08(i) of the bill, a provision allocating a part of the breakage generated by pari-mutuel wagering on horse races to various horse breed registries, and stated his desire to see language added that would both require all of the breakage allocated to the horse breed registries to be paid first to the commission and authorize the commission to adopt rules regulating the horse breed registries' use of that breakage. *See* Debate on H.B. 2263 on the Floor of the Senate, 72d Leg. (May 18, 1991)

---

[6]In your request letter, you refer specifically to the deletion by House Bill 2263 of language in section 6.09(d) restricting the use of part of the breakage to "administration and accredited Texas bred-races." *See supra* note 5 for complete text of prior version. In your letter, you express concern that the deletion of the italicized language permits the TGA "unfettered discretion over the use of its share" and ask "whether the Commission can adopt rules to dedicate the funds to purposes consistent with the purposes of the Act."

(tape available from Senate Staff Services).[7]  Floor amendment 16, co-sponsored by Senator Leedom added to section 6.08(i) the proviso that the breakage allocated by section 6.08(i) to the horse breed registries was "to be paid to the commission for use by the appropriate state horse breed registry, subject to rules promulgated by the commission."[8]  This language is essentially the same as that added by floor amendment 16 to section 6.09(d).  Senator Chet Brooks, another co-sponsor of the amendment, in fact explained to the house that floor amendment 16 ensured that the same breakage limitations applied to horse racing and dog racing.  See Debate on H.B. 2263 on the Floor of the Senate, 72d Leg. (May 18, 1991) (tape available from Senate Staff Services). Given this history, we conclude the legislature intended to authorize the commission to adopt rules regulating the use of all breakage allocated by section 6.09(d), including the percentage set aside for stakes races.  Furthermore, we conclude that the legislature intended by the addition of the phrase "is to be paid to the commission for the use by the state greyhound breed registry, subject to rules promulgated by the commission" also to require that all breakage allocated by section 6.09(d) be paid first to the commission.

Our construction of section 6.09(d) can be harmonized with the requirement in the first sentence of section 6.09(d) that 50 percent of the breakage "is to be paid to the appropriate state greyhound breeding registry" since even if all 50 percent is first paid to the commission, it will be ultimately paid to the registry.[9]  This construction can also be harmonized with the statement in section 10.05 that the TGA "shall adopt rules to provide

---

[7]Prior to adoption of floor amendment 16, the senator had sponsored a floor amendment that was tabled which would have amended section 6.08(i) to pay the breakage allocated by that section to the commission for administration of the act rather than to the horse breed registries.  S.J. of Tex., 72d Leg. at 1713-14, 72d. Leg. (May 18, 1991) (floor amendment 12).

[8]As amended by floor amendment 16, section 6.08(i) provides "[t]en percent of the *total* breakage *from a live pari-mutuel pool or a simulcast pari-mutuel pool* is to be paid to the *commission for use by the* appropriate state horse breed registry, *subject to rules promulgated by the commission*." S.J. of Tex., 72d Leg., at 1717 (added language in italics); Acts 1991, 72d. Leg., ch. 386, § 29, at 1455.  The phrase "total breakage" is defined for purposes of the act as 98 percent of the breakage generated by pari-mutuel wagering on horse races.  V.T.C.S. art. 179e, § 6.08(h).  Floor amendment 16 also added the word "total" to section 6.09(d) to modify one of the four references therein to "breakage." See *supra* page 2.  Given the narrow definition the act gives to "total breakage," we do not rely on the use of that phrase in section 6.09(d) to support our conclusions here.

[9]The rules of statutory construction applicable here also require us to harmonize, if possible, all provisions of the act.  First, amendments to the same statute enacted at the same legislative session must be harmonized, if possible, and only if irreconcilable, will the latest in date of enactment prevail.  See *generally* Gov't Code § 311.025; 67 Tex. Jur. 3d *Statutes* § 137, at 753 (and authorities cited therein). Second, amendments that relate to the same subject, as they do here, should be construed if possible so that they operate in harmony with each other, and also with other provisions of the act that they amend, with all provisions mutually acting upon each other.  *Burlington Northern R.R. Co. v. Harvey*, 717 S.W.2d 371, 375-6 (Tex. App.–Houston [14th Dist.] 1986, writ ref'd n.r.e.); *Willaby v. State*, 698 S.W.2d 473, 477 (Tex. App.–Fort Worth 1985, no writ); Attorney General Opinion MW-383 (1981).

for the use of breakage received by it under Section 6.09(d) of this Act." While this statement by its terms does not provide for commission review and adoption of the TGA's rules, we conclude that the provision in section 10.04 that "[r]ules adopted by the registry [the TGA] are subject to commission approval" applies to the TGA's rules on breakage as well as to its rules establishing qualifications for greyhounds. The section 10.04 provision is not expressly limited to the TGA's rules establishing qualifications for Texas-bred greyhounds, and the senate added it to the act at the same time as the statement in section 10.05. S.J. of Tex., 72d Leg., at 1703 (May 18, 1991). In addition, we found no indication in the legislative history of the floor amendment adding section 10.04 and 10.05 to the act that the legislature intended the TGA's rules on breakage to take effect without prior commission approval. More importantly, as we explain later in this opinion, no other conclusion would render the section 10.05 statement constitutional.[10]

We are not able, however, to harmonize our construction of section 6.09(d) with the requirement in section 10.05 that the greyhound associations pay to the TGA breakage due it at least every 30 days. As mentioned above, the senate amended section 6.09(d) during the third reading on May 18, 1991, while sections 10.04 and 10.05 were added during the second reading earlier that day. This fact along with the legislative history of floor amendment 16 lead us to conclude that the conflicting payment requirement in section 10.05 is ineffective.

We turn now to the relevant constitutional principles.[11] State regulatory statutes must satisfy article II, section 1 and article III, section 1 of the Texas Constitution, which prohibit the legislature from delegating legislative powers "to the uncontrolled discretion of a private individual or entity." *See* Attorney General Opinion JM-509 (1986) at 3. Statutes with sufficient controls to ensure the accomplishment of public rather than private purposes, however, will not violate these constitutional provisions. *Compare Minton v. City of Fort Worth Planning Comm'n*, 786 S.W.2d 563 (Tex. App.--Fort Worth 1990, no writ) (replatting statute invalid because it delegated to narrow segment of community legislative power without controls on exercise of power) *with Dudding v. Automatic Gas Co.*, 193 S.W.2d 517 (Tex. 1946) (holding valid statute that incorporated by reference existing regulations of a private association, a copy of which was on file with state

---

[10]Our conclusion is also consistent with section 3.02 of the act which provides that "all persons and things relating to the operation of" race meetings involving wagering is subject to commission regulation.

[11]The legislature is presumed to act in compliance with the state and federal constitutions, and if the statutory provisions are reasonably susceptible of a construction rendering the provisions constitutional, that construction will be adopted. 67 Tex. Jur. 3d *Statutes* §§ 130, 133 at 731-42 (and other authorities cited therein); *see also* Gov't Code § 311.021(1).

agency).[12]   Thus, while the legislature or state agencies may request the advice and assistance of private individuals and entities in the drafting of regulatory rules, they must review and approve the final rules to be enforced against industry members or other members of the public.[13]   Our conclusion that sections 10.04 and 10.05, when read together, subject the TGA's rules on breakage to commission approval is consistent with this general principle, and thus, we need not find that section 10.05 violates article II, section 1 or article III, section 1 of the Texas Constitution.

This conclusion and our conclusion that section 6.09(d) authorizes the commission to adopt final rules for the TGA's use of all breakage it receives under that section are also consistent with general due process principles.  Adoption of regulatory statutes such as the racing act are within the state's police power to protect the peace, health or general welfare of the public.  *Williams v. State*, 176 S.W.2d 177, 182 (Tex. Crim. App. 1943); *Texas State Teachers Ass'n v. State*, 711 S.W.2d 421, 425 (Tex. App.--Austin 1986, writ ref'd n.r.e.).  Although a state's police power is broad, it may not exceed the state's duty to protect the welfare of its citizens "as consistently as may be with private property rights." *Brown v. Humble Oil & Refining Co.*, 83 S.W.2d 935, 943 (Tex. 1935).  Due process of law thus requires that the state exercise its police power only for public purposes and in a manner that ensures the accomplishment of those public purposes.  *Id.*; *Lone Star Gas Co. v. Kelly*, 165 S.W.2d 446, 449 (Tex. 1942) (the state's police power may not be exercised unless it results in a benefit to the public).  In *Texas Pharmaceutical Ass'n v. Dooley*, a Texas court applied these general principles and invalidated a statute requiring a state agency to turn over to a private pharmaceutical association part of the annual licensing fees imposed by the statute on pharmacists.  146 S.W.2d 206 (Tex. Civ. App.--Austin 1936, writ dism'd judgm't cor.).  The court concluded that the fee transfer provision was an invalid exercise of the state's police power because the private association was neither

---

[12]This office has previously held invalid statutes violating these constitutional provisions.  *See* Attorney General Opinions DM-159 (1992) (holding invalid statute delegating to private association selection of standards applicable to outdoor shooting ranges); JM-629 (1987) (adoption of fire safety code of private association without prior legislative review and sanction invalid); JM-509 (1986) (invalidating statute authorizing private entity to control sheriff's authority over deployment of his deputies).  *Compare* DM-135 (1992) (holding private entity's rulemaking subject to state agency's authority to adopt final rules) *with Texas Auto. Ins. Plan v. State Board of Ins.*, No. 92009771 (Dist. Ct. of Travis County, 126th Judicial Dist. of Texas, Nov. 25, 1992) (unpublished order reaching opposite conclusion) (currently on appeal).

[13]*See, e.g., North Am. Safety Valve Ind., Inc. v. Wolgast*, 672 F. Supp. 488 (D. Kan. 1987) (holding valid under Kansas law adoption by reference of private entity's standards required by statute to be submitted first to two state officials for approval and legislature for rejection or modification); 1A SUTHERLAND STATUTORY CONSTRUCTION § 4.11, at 142 (4th ed. 1984) (if state agency or official responsible for final adoption of rules submitted by private groups, rules generally are valid); 1 AM. JUR. 2d *Administrative Law* § 128, at 938-9 (statutes confining private participation in rulemaking to advisory role generally valid); *see also* V.T.C.S. art. 6252-13a, § 5(f) (authorizing state agencies to use advisory committees for rulemaking purposes).

obligated by law to enforce the statute, nor subject to any control by the state agency charged with enforcement of that statute and other state laws concerning the practice of pharmacy. *Dooley*, 146 S.W.2d at 330. Our conclusions that the commission is authorized to adopt rules regulating the TGA's use of all breakage it receives under section 6.09(d) and that the TGA's rules for the use of such breakage are advisory and subject to commission approval provide the regulatory control found lacking in the statute held invalid in *Dooley*.

In summary, we conclude that all of the breakage allocated by section 6.09(d) must be paid first to the commission. We also conclude that section 6.09(d) authorizes the commission to adopt rules regulating the TGA's use of all breakage allocated by that section, including the 25 percent set aside for stakes races. In accordance with sections 10.04 and 10.05, however, the TGA may propose rules on the use of breakage it receives under the act, but its rules are subject to commission approval, and thus, they may not take effect prior to receipt of that approval.

## S U M M A R Y

Section 6.09(d) of the Texas Racing Act, V.T.C.S. article 179e, requires all of the breakage allocated by that section, that is, the 50 percent of the breakage generated by pari-mutuel wagering on greyhound races, to be paid first to the Texas Racing Commission. That section also dedicates one-half of the 50 percent, or 25 percent, to stakes races. The Texas Racing Commission is authorized by section 6.09(d) to adopt rules regulating all breakage allocated by section 6.09(d), including the 25 percent set aside for stakes races. However, in accordance with sections 10.04 and 10.05 of the act, the Texas Greyhound Association may propose rules for the use of breakage it receives under the act, but those rules are subject to approval by the Texas Racing Commission.

Very truly yours,

DAN MORALES
Attorney General of Texas

WILL PRYOR
First Assistant Attorney General

MARY KELLER
Deputy Attorney General for Litigation

RENEA HICKS
State Solicitor

MADELEINE B. JOHNSON
Chair, Opinion Committee

Prepared by Celeste A. Baker
Assistant Attorney General

Mr. David J. Freeman - Page 9     (DM-211)